857 P.2d 1212

**STATE of Arizona, Appellee,**

**v.**

**Alvie Copeland KILES, Appellant.**

` No. CR–90–0106–AP.

Supreme Court of Arizona,
En Banc.

April 15, 1993.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Criminal Appeals Div., Phoenix, for the State.

Richard D. Engler, Yuma, for appellant.

OPINION

CORCORAN, Justice.

Appellant Alvie Copeland Kiles (defendant) was convicted by a jury of three counts of first-degree murder, in violation of A.R.S. § 13–1105, and two counts of child abuse, in violation of A.R.S. § 13–3623. The trial judge sentenced defendant to death for each first-degree murder conviction and to consecutive 22-year terms of imprisonment for the child abuse convictions. In this automatic appeal, defendant challenges his death sentences, but he does not challenge his convictions.[1] *See* A.R.S. § 13–4033; rules 26.15, 31.2(b), and 31.15(a)(3), Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to Ariz. Const. art 6, § 5(3), and A.R.S. §§ 13–4031, –4033.

## ISSUES PRESENTED

The following issues are raised in this appeal:

1. Did the trial court err by allowing the state to prosecute defendant for knowingly committing first-degree murder during the guilt phase and then finding that defendant committed two of the murders in an especially cruel manner during the sentencing phase?
2. Did the trial court err by not listing in its special verdict each non-statutory mitigating circumstance it considered in determining whether to impose the death penalty?
3. Did the trial court incorrectly find that defendant's capacity to conform his conduct to the law was not significantly impaired?
4. Did the trial court incorrectly find that defendant murdered the victims in an "especially heinous, cruel or depraved" manner?
5. Did the trial court incorrectly find that defendant previously had been convicted of two crimes of violence?
6. Is the fact that defendant committed the murders during a domestic dispute a valid consideration in a proportionality review?

## FACTS AND PROCEDURAL HISTORY

In January 1989, defendant began living with his girlfriend and her 5-year-old and 9-month-old daughters in Yuma, Arizona.[2] Approximately two weeks later, on February 9, 1989, defendant, who had a $200–$400/day cocaine habit, stole his girlfriend's purse and sold her food stamps to obtain money for cocaine. From mid-afternoon until about 11:00 p.m., defendant was away from the apartment. During that time, he injected the cocaine he purchased and some cocaine he received from friends; he also drank beer and gin.

Sometime after 11:00 p.m., defendant returned to his girlfriend's apartment, and they argued about his theft of her food stamps. At some point during this argument, defendant's girlfriend slapped him. When he told her not to hit him again, she responded by slapping him a second time. Defendant then left the apartment, got the

1. Notwithstanding defendant's choice not to challenge his convictions, we have reviewed the trial record and determined that sufficient evidence supports defendant's convictions. We have also reviewed the trial record for fundamental error pursuant to A.R.S. § 13–4035 and have found none.

2. Throughout this opinion we will refer to the victims as the "girlfriend," the "5-year-old," and the "9-month-old" in accordance with our policy that appellate judges should avoid referring to victims by name in appellate opinions. *See State v. Bartlett,* 164 Ariz. 229, 230 n. 1, 792 P.2d 692, 693 n. 1 (1990), *vacated on other grounds,* — U.S. —, 111 S.Ct. 2880, 115 L.Ed.2d 1046 (1991).

jack stem out of his car, returned to the apartment, and hit his girlfriend with it, knocking her unconscious. When his girlfriend regained consciousness and asked him, "Why did you do that?", defendant proceeded to beat her to death with the jack stem. Defendant next turned the weapon on his girlfriend's children and killed them. Defendant then placed the children's bodies in plastic bags and threw them in the Colorado River. He left his girlfriend's body in the apartment.

The next day, defendant continued using cocaine. That afternoon, he began telling people about the murders. In his discussions with various individuals, defendant stated that he killed his girlfriend because she was "ragging" on him about the food stamps and he just "went off." He also stated that he killed the children because they were screaming and because they had seen him kill their mother.

Defendant eventually told 5 people about the murders, one of whom was his friend, Kale Johnson (Johnson). When Johnson did not believe his story, defendant took Johnson to his girlfriend's apartment. At the apartment, Johnson suggested that defendant call an ambulance because he thought the girlfriend was still alive. Defendant refused to call an ambulance, stated that his girlfriend was dead, and then stepped on her face while walking into a bedroom. Later, when Johnson ventured too close to the front door of the apartment, defendant broke a broom handle over Johnson's back and ordered him to stay away from the doors and windows. Defendant and Johnson then took several items from the apartment, some of which defendant later sold for cocaine.[3]

Sometime later that night, defendant told his mother about the murders when he visited her at the Elks Lodge where she was working. After defendant left, his mother called the police to report the murders.

Physical evidence found at the girlfriend's apartment corroborated defendant's statements about the murders. Upon their arrival at the apartment in the early morning hours of Saturday, February 11, 1989, the police found defendant's girlfriend's body wrapped in a bedspread and laying in the hallway. The apartment was in total disarray, and there was a significant amount of blood in the living room and the two bedrooms. A portion of a bumper jack was found in one of the bedrooms. The two children were not found in the apartment.

The police arrested defendant in connection with the murders at approximately 8:30 a.m. the next morning at a friend's apartment, where he was found hiding under a bed.

The girlfriend's autopsy showed that she suffered extensive blunt trauma to the head, face, neck, upper extremities, and trunk. She had multiple lacerations and multiple skull fractures. In addition, all of her front teeth were shattered, she had a fractured right forearm, and she had two puncture wounds on the tip of her left elbow.

The body of the 9–month–old baby, clad only in a diaper, was found approximately one week later floating in a canal in Morelos, Mexico. The autopsy showed that the baby's skull was completely shattered, that she had a hole in her forehead, and that she had extensive skin lacerations.

The body of the 5–year–old child has not been found.

A Yuma County grand jury initially indicted defendant for first-degree murder of his girlfriend, first-degree murder of the 9–month–old baby, and child abuse of the baby. Two months later, a grand jury indicted defendant for first-degree murder and child abuse of the 5–year–old child. The two indictments were consolidated for trial.

Defendant did not confess to the police after he was arrested. Therefore, at trial, defendant's own extrajudicial admissions of guilt to various people provided the crucial evidence against him. Additional evidence

3. Johnson was later arrested and indicted for hindering prosecution in the first degree, a class 5 felony, in connection with his actions in this case. Johnson pleaded guilty to that charge.

presented by the state at trial included testimony by Edward Trujillo, a criminalist at the Arizona Crime Laboratory, who described the location in the apartment of blood stains from the identified victims (the girlfriend and the baby), as well as the location of blood stains from an unidentified victim. With regard to the unidentified blood stains, Robert Williams, Ph.D., who tested the blood stains from the unidentified victim and the blood of the 5–year–old child's father and deceased mother, testified that there was a 97.36% probability that the unknown blood stains originated from the missing 5–year–old child. In addition, Tom Bevel, a blood stain interpretation expert, testified that certain blood stains in the west bedroom of the apartment, previously identified by Edward Trujillo as coming from the baby, showed that 14 separate blows had been struck. Finally, Robert Mallon, M.D., the doctor who performed the autopsies, testified that the girlfriend's elbow puncture wounds and fractured right forearm were indicative of defensive wounds. He was unable to determine how many blows the girlfriend and the baby received or how long the girlfriend remained conscious during the attack. He did testify, however, that any one of several of the head blows received by the girlfriend and the baby could have been fatal.

The defendant did not testify at trial, nor did he present a defense. However, defense counsel did cross-examine witnesses about defendant's history of drug abuse and his drug intoxication around the time of the murders. The jury returned guilty verdicts on each charge against defendant.

At the sentencing hearing held pursuant to A.R.S. § 13–703(B), psychiatrist Alexander Don, M.D., testified on behalf of defendant. He diagnosed defendant as having an "adjustment disorder with depressed mood of mild to moderate intensity" and a mixed personality disorder consisting of narcissistic, paranoid and explosive features. He also testified that defendant had a constitutional predisposition for substance abuse and that defendant abused cocaine, alcohol, and heroin.

With regard to defendant's cocaine abuse, Dr. Don stated that a cocaine addict may experience "paranoia, suspiciousness, mistrust, loss of impulse control and, at its most extreme, a form of paranoid psychosis [in] which he loses contact with realities, [has] false beliefs, [and] sees and hears things not really there." This cocaine psychosis is indistinguishable from paranoid schizophrenia. Dr. Don found that defendant's craving for cocaine was so intense around the time of the murders that he could not resist using cocaine; but, Dr. Don also determined that at the time of the murders defendant did not suffer from paranoid delusions, loss of reality, neurological disfunction, or psychosis.

With regard to defendant's personality disorder, Dr. Don testified that defendant has "a tendency to mistrust, paranoia, thought psychosis, ... explosiveness, short temper and narcissism.... [Defendant] was not a well adjusted individual prior to the present circumstances." Although defendant was aware "of the nature and quality of his conduct as well as the wrongfulness of his conduct" at the time of the murders, Dr. Don concluded that "the combination of drug and disordered personality substantially contributed to [defendant's] inability to conform his conduct to the requirements of the law" when he murdered his girlfriend and her two children, although defendant "probably would not have committed the act" if a police officer had been present.

Dr. Don's impairment conclusion was based on the fact that defendant

> was violating the laws by using illicit substances, by the acts which he had to perpetrate in order to keep the drug use, hustling, stealing, perhaps selling as well, stealing of food stamps from [his girlfriend] as well. These were all indications of impairment and inability to conform to the requirements of the law.... [Defendant] was satisfying his drug usage and drug need rather than conforming to the law.

In sum, Dr. Don believed that defendant's "impulse control was substantially impaired.... [H]e did not restrain himself

from the behaviors which led to the present charges."

Defense counsel also introduced a report by a psychologist, Donald Tatro, Ph.D., on behalf of defendant. In his report, Dr. Tatro stated that defendant's personality has two sides: one caring, the other paranoid and hostile. The hostile personality is triggered by drugs, alcohol, "deep emotional entanglements, acting-out friends, and situations with a high potential for competitive conflict." As defendant became increasingly addicted to cocaine, his hostile personality became dominant. However, Dr. Tatro also reported that there is no indication that defendant presents a case of multiple personality.

Dr. Tatro diagnosed defendant as having intermittent explosive disorder and narcissistic personality disorder. In addition, he diagnosed defendant as being dependent on cocaine and alcohol, as well as being a heroin abuser. According to Dr. Tatro, defendant's basic personality problem is "an over-developed need for passive-dependent gratification and an overly egocentric view of himself and the world around him.... The one thing that you [do] not do with [defendant is] to make him feel inferior in any way." When defendant's girlfriend slapped him and told him to get out of her home, "she became the symbol of all the ego-obliterating, rejecting people in his life. He could not cope with another rejection. The infantile rage rose up within him."

Dr. Tatro concluded that

> [i]n all likelihood, if [defendant] had not been so intoxicated with cocaine and alcohol, he would have been able to contain the rage.... [Defendant's] homicidal behavior was the result of cocaine intoxication interacting with long-standing psychological conflicts and traits of personality. The cocaine addiction by itself—that is, independent of the psychological conflicts—would not have been enough to cause him to behave as he did. Conversely, ... he would [not] have acted as he did had it not been for the effects of cocaine on his personality.

The state presented two expert witnesses at the presentence hearing to rebut defendant's contention that his ability to conform his conduct to the requirements of the law was significantly impaired at the time of the murders. A psychiatrist, Robert Dean, M.D., diagnosed defendant as a polysubstance abuser and as having a mixed personality disorder with narcissistic and antisocial characteristics. Dr. Dean testified that defendant was able to exercise control over his acts at the time of the murders and that defendant's "capacity to conform his behavior to expected norms according to the law was not significantly impaired." By defendant's own admission, he has always had a short fuse, whether under the influence of drugs or sober. And, "[d]rugs such as cocaine, heroin, alcohol, etc., do not in and of themselves, create aberrant behavior. The aberrant behavior patterns that may occur are already present within the personality of the individual manifesting them." Therefore, Dr. Dean concluded that although defendant's judgment and impulse control were probably inhibited by his cocaine and alcohol use, he was nevertheless aware of his actions and had the ability to control himself at the time of the murders.

Finally, psychologist Ashley Hart, Ph.D., diagnosed defendant as having narcissistic personality disorder, smoldering dysthymia, and polysubstance dependence. He testified that defendant appreciated the criminality of his conduct at the time of the murders, and he acted in response to an "irresistible impulse." Dr. Hart also testified that defendant would not have acted on the impulse, however, if a policeman had been at his elbow, and that defendant knew the relationship between the use of intoxicants and his violent behavior. Moreover, defendant had a choice not to use intoxicants because he left prison drug-free approximately 5 months before the murders.

Toward the end of his testimony, Dr. Hart more explicitly agreed that "the combination of the intoxication and the personality disorder ... significantly impaired ... defendant's capacity to conform his conduct to the requirement of the law...."

However, he also stated that he did not "believe that substance abuse alone can explain [defendant's] problems that he's had historically with the law...."

Defendant did not testify at the presentence hearing, but he did submit a statement to the court in allocution. With regard to the nature of the murders, defendant stated that there was "no struggle or scream because everyone was killed instantly.... They were just killed very quick, in a blind rage." Defendant also placed responsibility for his actions on his drug use, stating, "I know if it wouldn't have been for my addiction and alcohol this would have been prevented, but it did happen. I had been using drugs with alcohol, on a regular basis, day and night for the last four months before this had taken place." Defendant did not express remorse or regret in his statement, but simply stated that the purpose of his allocution to the court was "to get the facts straight so that I will be punished for what actually happened."

On March 28, 1990, the trial court issued its special verdict. Concerning the murder of the girlfriend, the court found that the state had proved beyond a reasonable doubt the following statutory aggravating circumstances: (1) defendant was twice previously convicted of a violent felony in the United States, A.R.S. § 13-703(F)(2); (2) defendant committed the offense in an especially cruel manner, § 13-703(F)(6); (3) defendant committed the offense in an especially heinous or depraved manner, § 13-703(F)(6); and (4) defendant committed the murder during the commission of two other murders, § 13-703(F)(8).

With regard to the murder of the 9-month-old baby, the court found that the state had proved beyond a reasonable doubt the following statutory aggravating circumstances: (1) defendant was twice previously convicted of a violent felony in the United States; (2) defendant committed the offense in an especially heinous or depraved manner; (3) defendant committed the murder during the commission of two other murders; and (4) defendant was an adult at the time he committed the offense, and the victim was under the age of 15, A.R.S. § 13-703(F)(9).

For the murder of the 5-year-old child, the court found that the state had proved beyond a reasonable doubt the following statutory aggravating circumstances: (1) defendant was twice previously convicted of a violent felony in the United States; (2) defendant committed the offense in an especially heinous, cruel or depraved manner; (3) defendant committed the murder during the commission of two other murders; and (4) defendant was an adult at the time he committed the offense, and the victim was under the age of 15.

In mitigation of these counts, the trial court considered all of the mitigating circumstances enumerated in § 13-703(G) and "all other information offered to the court which might be relevant to any mitigating circumstance." The trial court found as a mitigating circumstance that "defendant was probably under the influence of chemical substances, including alcohol and cocaine, at the time of his commission of [the] offense[s]...." However, the court also found that defendant's "capacity to appreciate the wrongfulness of his conduct at that time or to conform his conduct at that time to the requirements of law was not significantly impaired," thus rejecting the statutory mitigating circumstance of impaired capacity. A.R.S. § 13-703(G)(1). The trial court also stated that defendant's "being under the influence of chemical substances ... could be the only mitigating factor in this case."

Finally, the court determined that any one of the aggravating circumstances was "sufficient in itself to offset any mitigating circumstance" and that there was "no mitigating circumstance sufficiently substantial to call for leniency as to any one of [the] aggravating circumstances...." Accordingly, the trial court imposed death sentences for all three murder convictions. It also sentenced defendant to consecutive 22-year prison terms for each child abuse conviction. Finally, the court ordered defendant to pay restitution in the amount of $2,291.70 to the family of the victims and

$4,909.45 to the Victim's Compensation Fund. This automatic appeal followed.

## DISCUSSION

### I. The Trial Court Did Not Err by Allowing the State to Prosecute Defendant for Knowingly Committing First-Degree Murder and Then Finding That Defendant Committed Two of the Murders in an Especially Cruel Manner

Despite defendant's argument to the contrary, it was both consistent and fundamentally fair for the trial court to allow the state to prosecute defendant for "knowingly" killing the victims and then to sentence defendant to death, in part, because defendant committed two of the murders in an especially cruel manner.

#### A. *The Guilt Phase Proceedings*

At trial, defendant requested that the trial court give the following voluntary intoxication instruction to the jury:

> No act committed by a person while intoxicated is less criminal by reason of intoxication. However, for the crime of First Degree Murder with Pre-Meditation there must be proof that the defendant acted intentionally or knowingly. If you determine that the defendant was intoxicated at the time, you may consider whether he could have committed the crime intentionally or knowingly.

The trial court refused to give this instruction because the murder indictments charged defendant only with knowingly killing the victims, not with intentionally killing them.[4] The trial court based its decision not to give the instruction on our holding in *State v. Rankovich,* 159 Ariz. 116, 122, 765 P.2d 518, 524 (1988), that an accused is not entitled to a voluntary intoxication instruction if he is charged only with *knowingly* committing first-degree murder. Defendant does not challenge our *Rankovich* holding; however, he does contend that it was fundamentally unfair for the state to prosecute him only for acting knowingly, in order to preclude the voluntary intoxication defense; and then to argue at the sentencing hearing that the trial court should impose the death penalty because the defendant actually intended to kill. We find this argument to be without merit.

A first-degree murder conviction may be based on either intentional or knowing conduct. A.R.S. § 13-1105(A); *State v. Lavers,* 168 Ariz. 376, 389, 814 P.2d 333, 346, *cert. denied,* — U.S. —, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991). And, as we stated in *Lavers,* "the State's reasons for charging a knowing mental state rather than an intentional mental state are irrelevant.... Even if the State charged knowingly rather than intentionally to preclude the introduction of evidence of defendant's intoxication, we find such a legal strategy acceptable." 168 Ariz. at 389, 814 P.2d at 346. Thus, the state was entitled to prosecute defendant for first-degree murder under a theory of knowingly. Moreover, because the state charged defendant with acting knowingly, the trial court appropriately refused the voluntary intoxication instruction. *Rankovich,* 159 Ariz. at 122, 765 P.2d at 524. We find no error in the guilt phase of the proceedings against defendant.

#### B. *The Sentencing Phase Proceedings*

Defendant argues that once he was found guilty of acting knowingly, he could not be sentenced for acting intentionally because "[t]rial and sentencing ... are part of a continuum ... which begins with an indictment and may end with an execution." Defendant contends that the trial court imposed the death penalty because, in finding the aggravating circumstance of cruelty, the trial court determined that de-

4. A person commits first-degree murder if "[i]ntending or knowing that his conduct will cause death, such person causes the death of another with premeditation," A.R.S. § 13-1105(A)(1), or causes the death of any person "in the course of and in furtherance of" a specified felony. A.R.S. § 13-1105(A)(2). In this case, the grand jury indicted defendant for "knowingly" committing the three murders with premeditation. In addition, the grand jury alternatively charged defendant with knowingly committing the felony murders of the two children by knowingly committing child abuse which resulted in their deaths.

fendant intended to kill. We reject this contention.

We first note that to find the aggravating circumstance of cruelty, a trial court need not find that a defendant intended to kill; it must determine that a defendant *either intended* to inflict *mental anguish or physical pain* upon a victim *or "reasonably fore[saw]* ... a substantial likelihood" that his actions would have that effect. *State v. Adamson,* 136 Ariz. 250, 266, 665 P.2d 972, 988 (1983) (emphasis added), *citing State v. Gretzler,* 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983). Defendant would have this court find fundamentally unfair a conviction based upon a knowing killing coupled with a death sentence based on an intentional killing; but, we are not faced with such a case. First, the intent required to establish the aggravating circumstance of cruelty is not that defendant intended to *kill* the victims. As shown above, cruelty may be found when a defendant intends to inflict mental anguish or physical pain. Such a finding does not equate with a finding that a defendant intended to kill.

Further, defendant's death sentence was not necessarily based on a trial court finding that he acted intentionally. The trial court may have concluded simply that defendant *reasonably foresaw* that his actions would inflict mental anguish or physical pain upon his victims. We do not believe that the mental state of "reasonably foreseeing" is a more culpable mental state than "knowingly." "Knowingly" means "that a person is aware or believes that his or her conduct is of that nature or that the circumstance exists." A.R.S. § 13-105(6)(b). In fact, defendant concedes that "it may be argued that reasonable foreseeability is equivalent to knowingly." Thus, contrary to defendant's assertions, defendant was not necessarily sentenced under a different culpable mental state from that under which he was convicted.

Recognizing this flaw in his argument, defendant contends that the trial court's finding of cruelty in this case and the resulting imposition of the death penalty were based "largely upon the basis that the defendant acted with intent." Defendant urges that the state argued intent at the presentence hearing and that "[c]ertainly a reading of the trial court's special verdicts can come to no other conclusion but that the trial court imposed the death penalty largely because it accepted the state's argument [that defendant actually intended to kill]." Our reading of the record, however, does not convince us that either the state or the trial court focused on defendant's intentional conduct with regard to the aggravating factor of cruelty. Moreover, such an inquiry into the knowing versus intentional basis of the trial court's cruelty finding is unnecessary because conviction and sentencing are two separate proceedings.

In Arizona, all findings relevant to sentencing are made by the court alone. A.R.S. § 13-703(B). "[T]he juror's duty is to determine guilt or innocence, while the sentence of death is solely the responsibility of the trial judge." *State v. Martinez-Villareal,* 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985). Because conviction and sentencing are two separate proceedings, at trial the state was only required to prove beyond a reasonable doubt each element of the offense of first-degree murder. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) (due process protects "accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). The state was not required to prove any sentencing theory to the jury. *See Walton v. Arizona,* 497 U.S. 639, 649, 110 S.Ct. 3047, 3054, 111 L.Ed.2d 511 (1990) ("[T]he Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."), *quoting Cabana v. Bullock,* 474 U.S. 376, 385, 106 S.Ct. 689, 696, 88 L.Ed.2d 704 (1986); *State v. Lambright,* 138 Ariz. 63, 74, 673 P.2d 1, 12 (1983) (defendant has no right to have jury participate in sentencing), *citing Gretzler,* 135 Ariz. at 56, 659 P.2d at 15; *State v. Richmond,* 136 Ariz. 312, 316, 666 P.2d 57, 61 (1983) (there is no constitutional right to have jury find aggravating or mitigating circumstances) (cita-

tions omitted). Also, during the sentencing proceedings, the state was entitled to offer additional evidence and argument concerning the appropriateness of imposing the death penalty, and the judge was entitled to consider any relevant sentencing information within the parameters of A.R.S. § 13–703(C) and rule 15.1(g)(2), Arizona Rules of Criminal Procedure. *See also Gregg v. Georgia,* 428 U.S. 153, 191, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976) (once guilt is determined, additional relevant information may be considered for sentencing) (citation omitted); *State v. Ortiz,* 131 Ariz. 195, 208, 639 P.2d 1020, 1033 (1981) (any relevant evidence may be used to rebut defendant's mitigating circumstances, even if inadmissible at trial). Moreover, during the sentencing phase, defendant was entitled to, and did in fact, introduce mitigating evidence of his intoxication. Therefore, even if the trial court based its finding of cruelty on defendant's intentional conduct, such a finding was constitutionally permissible.

In sum, it was not fundamentally unfair or legally inconsistent for the state to prosecute defendant on the substantive offense of first-degree murder under a theory of knowingly and then to argue at sentencing (if it did so) that the defendant should receive the death penalty because he intentionally inflicted physical or mental pain upon the victims. The trial court did not err by refusing the voluntary intoxication instruction and thereafter imposing the death penalty because it found that defendant committed two of the murders in an especially cruel manner.

II. The Death Sentence

A. *The Trial Court Did Not Err by Failing to List in Its Special Verdict Each Non-Statutory Mitigating Circumstance It Considered*

Defendant contends that the trial court improperly imposed the death penalty because the trial court's special verdict lacks the required specificity regarding the non-statutory mitigating factors it considered and rejected. The trial court's broad assurance that it considered all mitigating circumstances enumerated in A.R.S. § 13–703(G) and all other relevant mitigating information does not, defendant argues, meet the constitutional requirement that the trial court list all of the mitigating factors it considered and explain its analysis of those factors. In support of his argument, defendant cites *State v. Leslie,* 147 Ariz. 38, 50, 708 P.2d 719, 731 (1985), where this court stated:

> In short, if we cannot determine from the record whether the trial court considered all the relevant mitigating factors, the federal constitution compels us to remand the case for further explanation. Practically, unless the trial judge tells us what factors he has considered and why he has rejected them, we cannot assure ourselves that he has acted properly.

Defendant acknowledges that this court has "retreated somewhat from its holding in *Leslie,*" but he contends that his death sentence must be set aside because the trial court "made no effort whatsoever to even list any of the mitigating circumstances which defense counsel attempted to bring to the court's attention." We do not agree.

In *State v. Walton,* 159 Ariz. 571, 585, 769 P.2d 1017, 1031 (1989), this court later determined that the trial court must "return a special verdict setting forth the existence or nonexistence of the ... mitigating factors listed in [A.R.S. § 13–703(G)].... [D]ue process requires no more than a clear listing of the factors involved...." Because § 13–703(G) defines mitigating circumstances as "any factors proffered ... which are relevant" to sentencing, defendant urges this court to require a laundry list of all circumstances offered in mitigation by defendant and an analysis of each.

But, as we stated in *Walton,* although such "meticulous detail" may be applauded, it is not required. 159 Ariz. at 585, 769 P.2d at 1031. The trial judge's special verdict (a copy of which is attached as an Appendix as an example for future cases) demonstrated that the judge had considered the evidence and resolved the relevant factual issues. The judge listed and explained his findings on statutory aggrava-

ting circumstances, indicated he had considered the mitigating evidence, and made a specific finding resolving all factual issues on the one important mitigating circumstance raised by the evidence. The judge is not required to make a laundry list of findings on every nuance or every issue raised by a defendant. He or she is required only to render a verdict containing findings sufficiently specific to enable us to make a meaningful review.

It is sufficient, therefore, if the special verdict resolves the material and relevant factual disputes raised by the evidence and tells us what significant mitigating circumstances were found by and weighed by the judge. This will enable us to determine whether he or she omitted or failed to weigh a material factor that we believe was established by the evidence. While the judge should make findings enabling us to perform a meaningful review, we "have never required a sentencing judge to make detailed, exhaustive findings or cite every claim or nuance advanced by defendant or his counsel in argument." *State v. McCall,* 160 Ariz. 119, 125, 770 P.2d 1165, 1171 (1989) (citation omitted), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3289, 111 L.Ed.2d 798 (1990). If it is clear from the record that the trial court considered all mitigating evidence offered by defendant, due process does not require that the court document its analysis of each mitigating factor. *Clark v. Ricketts,* 958 F.2d 851, 858 (9th Cir.1991). We find no error in this case.

B. *Independent Review of the Death Sentences*

In every capital sentencing case, this court must independently review the existence of aggravating and mitigating circumstances and weigh them against each other in order to determine whether the death penalty was properly imposed by the trial court. A.R.S. § 13–4035; *State v. Stevens,* 158 Ariz. 595, 598, 764 P.2d 724, 727 (1988); *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976). We now undertake this review.

1. Aggravating Circumstances

The death penalty may be imposed only if at least one of 10 statutory aggravating circumstances exists. A.R.S. § 13–703(E); *State v. Rockwell,* 161 Ariz. 5, 14, 775 P.2d 1069, 1078 (1989). An aggravating circumstance must be proved "beyond a reasonable doubt." *State v. Richmond,* 136 Ariz. 312, 322, 666 P.2d 57, 67 (1983). For each of defendant's three murder convictions, the trial court found the existence of some combination of the following 4 aggravating circumstances: (1) "defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person," A.R.S. § 13–703(F)(2); (2) "defendant committed the offense in an especially heinous, cruel, or depraved manner," § 13–703(F)(6); (3) "defendant has been convicted of one or more other homicides ... which were committed during the commission of the offense," § 13–703(F)(8); and (4) "defendant was an adult at the time the offense was committed ... and the victim was under fifteen years of age," § 13–703(F)(9).[5]

a. *Prior Convictions for Felonies Involving Violence*

The trial court concluded that defendant had been previously convicted of two felonies involving the use or threat of violence and therefore found the existence of the § 13–703(F)(2) aggravating circumstance for each murder. The trial court based its finding on the fact that defendant had been previously convicted of attempted aggravated assault, a class 4 felony, in violation of A.R.S. §§ 13–1001 and –1204(A)(1), and of aggravated assault, a class 6 felony, in violation of A.R.S. §§ 13–1203 and –1204(A)(8).

In order to qualify as a § 13–703(F)(2) aggravating circumstance, a prior felony conviction must be for a crime that, by statutory definition, involves the use or

5. Defendant has not challenged the trial court's finding of the existence of the § 13–703(F)(8) and (9) aggravating circumstances. Because the existence of these aggravating circumstances is obvious, we do not discuss them.

threat of violence on another person. *State v. Romanosky,* 162 Ariz. 217, 228, 782 P.2d 693, 704 (1989), *citing State v. Gillies,* 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983). Defendant argues that his prior convictions do not qualify in light of this court's decision in *State v. Fierro,* 166 Ariz. 539, 804 P.2d 72 (1990), that, under the statutory definition of aggravated assault, it is possible to commit aggravated assault without the use or threat of violence. We reject defendant's analysis of this issue.

In *Fierro,* the state presented no evidence indicating the specific subsection of the aggravated assault statute under which defendant had been convicted. Therefore, it was theoretically possible that Fierro had been convicted for *recklessly* causing serious bodily injury to another. *Fierro,* 166 Ariz. at 550 n. 9, 804 P.2d at 83 n. 9. Because the reckless infliction of physical injury does not necessarily involve the use or threat of violence, we determined that Fierro's prior Arizona conviction for aggravated assault did not qualify as a § 13–703(F)(2) aggravating circumstance. *Id.*

Here, however, the record shows that defendant was convicted under subsection (A)(8) of the aggravated assault statute for committing an assault "while the victim [was] bound or otherwise physically restrained or while the victim's capacity to resist [was] substantially impaired." A.R.S. § 13–1204(A)(8). We believe that a conviction under this subsection necessarily involves the use or threat of violence. The binding or restraining of a victim requires the "exertion of any physical force so as to injure *or abuse*" and thus establishes the use or threat of violence. *See State v. Arnett,* 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978) (defining "violence") (emphasis added). Likewise, an assault committed while a "victim's capacity to resist is substantially impaired" involves the use or threat of violence because the term "resist" implies an intentional injurious or abusive act by the assailant. The trial court correctly found defendant's conviction for aggravated assault to be a § 13–703(F)(2) aggravating circumstance.

Defendant's attempted aggravated assault conviction also qualifies as a § 13–703(F)(2) aggravating circumstance. As noted above, our concern in *Fierro* was that the defendant could have been convicted of aggravated assault for *reckless* conduct, 166 Ariz. at 550 n. 9, 804 P.2d at 83 n. 9, which does not establish the use or threat of violence. Here, however, defendant could not have been convicted of reckless behavior because attempt is a specific intent crime and by definition involves *intentional* conduct. A.R.S. § 13–1001(A)(2) ("A person commits attempt if ... [he] ... *[i]ntentionally* does or omits to do anything which ... is any step in a course of conduct planned to culminate in commission of an offense....") (emphasis added); Rollin M. Perkins, *Criminal Law* 637 (3d ed. 1982) ("[A]n attempt to commit any crime requires a specific intent to commit that particular offense.") (footnote omitted). We therefore find that the trial court correctly considered defendant's prior conviction for attempted aggravated assault to be an aggravating circumstance under § 13–703(F)(2).

b. *Heinous, Cruel or Depraved*

Section 13–703(F)(6) provides that a killing committed in a heinous, cruel or depraved manner must be considered an aggravating factor when determining whether the death penalty should be imposed. Because the three listed circumstances are stated in the disjunctive, a finding of any one of them is sufficient to establish the existence of the § 13–703(F)(6) aggravating circumstance. *State v. Wallace,* 151 Ariz. 362, 366–67, 728 P.2d 232, 236–37 (1986). The trial court determined that this aggravating circumstance applied to each of the murders. First, the trial court found that defendant committed his girlfriend's murder in an especially cruel manner "as demonstrated by the prolonged, vicious beating of the victim with a jack stem over a period of time during a portion of which the victim was clearly conscious," and in an especially heinous or depraved manner "as evidenced by his apparent relishing of the crime, demonstrated

by the prolonged, vicious beating of victim, the infliction of gratuitous violence upon the victim, the helplessness of the victim, and by his stepping on the head of the victim by showing the crime scene to [Johnson]."

Second, the court found that defendant murdered the 5-year-old in an especially cruel, heinous or depraved manner

> as indicated by the fact [she] was old enough to appreciate and be aware of the protracted and violent assault upon her mother; ...
>
> Further, the terror inflicted on the child by witnessing the defendant's actions towards her mother and immediately preceding her own death was simply beyond imagination and clearly must have conveyed to her the prospect of her own impending death to be accomplished with the same jack stem the defendant wielded over and over again upon the child's mother.

Finally, the court determined that the 9-month-old baby was murdered in an especially heinous or depraved manner "as evidenced by [defendant's] apparent relishing of the crime, demonstrated by his repeatedly striking the child with the jack Stem and by the infliction of gratuitous violence upon her and by reason of her helplessness."

We review each of these findings of cruelty and/or heinousness or depravity in turn.

i. Cruelty

A murder is committed in an especially cruel manner if the perpetrator inflicts mental anguish or physical pain upon the victim before the victim's death. *State v. Walton,* 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1989), *citing State v. Correll,* 148 Ariz. 468, 479–80, 715 P.2d 721, 733 (1986); *State v. Gretzler,* 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983). Mental anguish includes a victim's uncertainty about her ultimate fate. *State v. Lavers,* 168 Ariz. 376, 392, 814 P.2d 333, 349, *citing Walton,* 159 Ariz. at 586, 769 P.2d at 1032, *cert. denied,* — U.S. —, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991); *State v. McCall,* 139 Ariz. 147, 161, 677 P.2d 920, 934 (1983). We have previously determined that cruelty exists in the mental pain suffered by a victim who witnesses the killing of a family member before she herself is killed. *Lavers,* 168 Ariz. at 392, 814 P.2d at 349, *citing State v. Smith,* 146 Ariz. 491, 504, 707 P.2d 289, 302 (1985); *State v. Tison,* 129 Ariz. 526, 543, 633 P.2d 335, 352 (1981); *McCall,* 139 Ariz. at 161, 677 P.2d at 934.

As noted above, the trial court found that defendant murdered his girlfriend in an especially cruel manner because she suffered a "prolonged, vicious beating ... during a portion of which she was clearly conscious." Defendant correctly argues that when a victim is bludgeoned to death, the state must prove beyond a reasonable doubt that the victim experienced pain before losing consciousness. *See State v. Villafuerte,* 142 Ariz. 323, 331, 690 P.2d 42, 50 (1984) (cruelty does not exist if victim is unconscious when violent acts causing death are committed); *cf. Wallace,* 151 Ariz. at 367, 728 P.2d at 237 (cruelty does not exist if victim is unconscious at time of death); *State v. Poland,* 144 Ariz. 388, 405, 698 P.2d 183, 200 (1985) (same). We believe the state met this burden.

The evidence shows that although defendant initially knocked his girlfriend unconscious with the jack stem, she regained consciousness and asked, "Why did you do that?" A struggle then ensued, causing the apartment to be in disarray, and resulting in the girlfriend's receipt of numerous wounds, including extensive blunt trauma to the head, face, neck, upper extremities, and trunk, extensive multiple lacerations, multiple skull fractures, puncture wounds to the left elbow, a fractured right forearm, and shattered teeth. In addition, although the doctor who performed the autopsy was unable to determine how long the victim remained conscious during defendant's assault, he stated that the broken arm and elbow punctures were indicative of defensive wounds. Moreover, the location of the victim's blood on the front door threshold indicates that she may have attempted to escape. We believe that this

cumulative evidence provides sufficient evidence that the girlfriend suffered the pain of multiple blows before she lost consciousness and died. The trial court did not err in finding that defendant murdered his girlfriend in an especially cruel manner.

With regard to the murder of the 5-year-old, we agree with the trial court that her murder was especially cruel because of the mental anguish she suffered before she was bludgeoned to death.[6] The record indicates that the child saw defendant assault her mother, that she screamed and hollered, and that defendant murdered her because she saw him murder her mother. Defendant's contention that the 5-year-old did not witness his fatal assault of her mother is not supported by the evidence. Defendant told no fewer than three people, including his mother, that he murdered the two children because "they [could] talk" and because they were screaming and hollering.

Defendant's argument that the children's screaming and hollering "could have been the result of the children witnessing the violent scene at the doorway of the apartment, a scene in which their mother was yelling and slapping the defendant," is unpersuasive. Moreover, we do not accept defendant's argument that his two statements indicating that the children did not see him murder their mother make the evidence on this point inconclusive. Defendant only stated that the children did not see him murder their mother (1) when he spoke to a psychologist hired by his attorney almost 7 months after the murders, and (2) in his statement in allocution to the trial court after he was convicted of the three murders. The self-serving nature of these statements is obvious.

We believe that in this case "the circumstances surrounding [the child's death] and their effect on the [child] ... amply warrant the finding of cruelty." *State v. Gillies,* 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984). As stated by the trial court in its special verdict, "the terror inflicted on the [5-year-old] child by witnessing the defendant's actions towards her mother and immediately preceding her own death was simply beyond imagination and clearly must have conveyed to her the prospect of her own impending death...." We conclude that the 5-year-old's murder was committed in an especially cruel manner.

ii. Heinousness or Depravity

In contrast to the element of cruelty, which focuses on the victim's suffering and feelings, the statutory elements of heinousness and depravity concern the mental state and attitude of the killer, as reflected by his words and actions. *Gretzler,* 135 Ariz. at 51, 659 P.2d at 10 (citations omitted). A murder is committed in a depraved manner "when the perpetrator relishes the murder, evidencing debasement or perversion." *Walton,* 159 Ariz. at 587, 769 P.2d at 1033, *citing Gretzler,* 135 Ariz. at 51–52, 659 P.2d at 10–11. A murder is committed in a heinous manner if it is "hatefully or shockingly evil: grossly bad." *State v. Knapp,* 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977). Factors which lead to a finding of heinousness or depravity include: (1) the apparent relishing of the murder by the killer; (2) the infliction of gratuitous violence on the victim; (3) the mutilation of the victim's body; (4) the senselessness of the crime; and (5) the helplessness of the victim. *State v. Brewer,* 170 Ariz. 486, 502, 826 P.2d 783, 799 (1992), *citing Gretzler,* 135 Ariz. at 51–52, 659 P.2d at 10–11.

We agree with the trial court that defendant relished the murders. Defendant evidenced a "callous fascination" with the murders and an "indifference to the suffering of the victim[s]" when he took Johnson to the apartment to prove that he had in fact killed his girlfriend and her two children, and when, in response to Johnson's request to call an ambulance, he stated that his girlfriend was dead and stepped on her face.

6. The trial court did not set forth physical pain as an independent ground for the cruelty finding. On appeal, the state has not urged it as an independent ground; therefore, we do not consider it.

Defendant also inflicted gratuitous violence upon his girlfriend and the 9-month-old baby. Defendant initially knocked his girlfriend unconscious with one blow. Then, after she regained consciousness, he continued bludgeoning her with the jack stem, fracturing her skull, shattering her teeth, and breaking her arm. The 9-month-old baby was helpless, not old enough to talk, and totally unable to defend herself, yet defendant struck her with the jack stem approximately 14 separate times, completely shattering her skull and spreading her blood upon the 4 walls and the ceiling of her bedroom.

Defendant contends that these murders did not involve the infliction of gratuitous violence because "all deaths by bludgeoning involve repeated blows." However, the evidence shows that any one of several of the blows defendant inflicted on his girlfriend and the baby could have killed them. Therefore, defendant's actions clearly amount to the "infliction of gratuitous violence on the victim beyond the murderous act itself." *Brewer,* 170 Ariz. at 502, 826 P.2d at 799, *citing Gretzler,* 135 Ariz. at 51–52, 659 P.2d at 10–11.

"[D]efendant's conduct in continuing his barrage of violence ... beyond even the point necessary to kill, [indicates a] ... depraved nature so as to set it apart from the 'usual or the norm.'" *State v. Ceja,* 126 Ariz. 35, 40, 612 P.2d 491, 496 (1980), *quoting State v. Ceja,* 115 Ariz. 413, 417, 565 P.2d 1274, 1278 (1977).

Moreover, the heinousness and depravity of the children's murders is further indicated by the senselessness of the murders and the helplessness of the children. Neither child was old enough to defend herself against defendant's attack or even to support her mother in the argument between her mother and defendant. The killing of two helpless children is senseless and demonstrates a total disregard for human life, *Stanley,* 167 Ariz. at 528, 809 P.2d at 953, and is also evidence of a "shockingly evil state of mind." *State v. Wallace,* 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986), *quoting State v. Tison,* 129 Ariz. 526, 543, 633 P.2d 335, 352 (1981). The fact that defendant killed the children because "they [could] talk" further proves defendant's total disregard for human life and indicates depravity. *State v. Correll,* 148 Ariz. 468, 481, 715 P.2d 721, 734 (1986).

We agree with the trial judge that all three murders were committed in an especially heinous, cruel or depraved manner.

2. Mitigating Circumstances

When sentencing a defendant convicted of first-degree murder, the trial court must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining" whether the death penalty should be imposed. *State v. McCall,* 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983) (citation omitted). Although the trial court must consider all evidence offered by the defendant in mitigation, "it is within the discretion of the trial judge how much weight should be given to the proffered mitigating factors." *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990), *citing Jeffers v. Ricketts,* 627 F.Supp. 1334, 1357 (D.Ariz.1986), *aff'd in part, rev'd in part,* 832 F.2d 476 (9th Cir.1987), *rev'd,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). The defendant must prove the existence of a mitigating factor by a preponderance of the evidence. *Fierro,* 166 Ariz. at 551, 804 P.2d at 84.

Here, the trial court found the existence of one mitigating circumstance: "defendant was probably under the influence of chemical substances, including alcohol and cocaine, at the time of his commission of [the offenses]...." However, the trial court determined that this mitigating circumstance neither met the requirements of § 13–703(G)(1) nor was sufficiently substantial to call for leniency. Defendant maintains that the trial court erred in failing to find that he had proved, by a preponderance of the evidence, that his intoxication had significantly impaired his "capacity ... to conform his conduct to the requirements of law ... but not so ... as to constitute a defense to prosecution." A.R.S. § 13–703(G)(1).

Based on our review of the record, we conclude that the trial court did not improperly discount defendant's intoxication impairment. Although the trial court did not find significant impairment of defendant's capacity to conform his conduct to the law, the court nonetheless found some impairment based on defendant's intoxication and determined that it was a mitigating circumstance. This finding was proper in light of the conflicting evidence about the effect of defendant's intoxication. The trial court did not err when it refused to find the existence of the § 13–703(G)(1) mitigating circumstance.

We agree with defendant that there is ample evidence in the record to support a finding that defendant was intoxicated at the time of the murders. The record shows that defendant began using cocaine and heroin about 4 months before the murders, one month after he was paroled from prison after serving almost three years for an aggravated assault conviction. The record specifically shows that defendant was high on drugs for about two weeks prior to the murders and that defendant apparently had a $200–$400/day cocaine habit around the time of the murders. In addition, a neighbor testified that defendant was "fried," or extremely high, at about 5:00 or 5:30 on the evening of the murders, and an acquaintance of defendant's testified that he and defendant intravenously injected cocaine at a park at about 7:30 or 8:00 p.m. on the night of the murders. They also drank alcohol.

Voluntary intoxication is a mitigating circumstance under § 13–703(G)(1) if it significantly impairs a defendant's capacity to conform his conduct to the requirements of the law. *State v. Rossi,* 146 Ariz. 359, 367, 706 P.2d 371, 379 (1985). With regard to the effect of defendant's intoxication on his actions, two of the three expert witnesses who testified at the presentence hearing, including one of the state's experts, testified that defendant's ability to conform his conduct to the requirements of the law was significantly impaired at the time of the murders. The third expert testified that defendant's ability to conform his conduct was not significantly impaired. Another defense expert, who did not testify at the hearing but did submit a report to the court, essentially stated that defendant was unable to conform his conduct to the law at the time of the murders. Defendant argues, therefore, that he established the existence of the § 13–703(G)(1) mitigating circumstance by a preponderance of the evidence. We do not agree.

First, we conclude that the opinions of two of the experts finding that defendant's ability to conform his conduct to the law was impaired, psychiatrist Alexander Don, M.D., and psychologist Ashley Hart, Ph.D., do not support defendant's contention. Dr. Don, who testified on behalf of defendant, concluded that although defendant was aware "of the nature and quality of his conduct as well as the wrongfulness of his conduct" at the time of the murders, "the combination of drug and disordered personality substantially contributed to [defendant's] inability to conform his conduct to the requirements of the law." However, he also concluded that defendant "probably would not have committed the act" if a police officer had been present.

Dr. Hart testified for the state that, although defendant appreciated the criminality of his conduct at the time of the murders, "the combination of the intoxication and the personality disorder ... significantly impaired defendant's capacity to conform his conduct to the requirement of the law...." He agreed with Dr. Don, however, that defendant would not have committed the murders if a policeman had been at his elbow.

We refuse to equate defendant's *unwillingness* to control his actions with his *inability* to do so. *State v. Brewer,* 170 Ariz. 486, 506, 826 P.2d 783, 803 (1992). We believe that the conclusions of Drs. Don and Hart that defendant would not have committed the murders in the presence of a police officer reflect upon defendant's *willingness* to control his actions, not his ability to do so. We therefore conclude that their testimony regarding defendant's inability to conform his conduct to the law does not benefit defendant and does not

help to establish the existence of the § 13–703(G)(1) mitigating circumstance.

Second, we further discount the weight of Dr. Don's testimony because he concluded that defendant's ability to conform his conduct to the requirements of the law was significantly impaired

> as evidenced both by the fact of his using he was violating the laws by using illicit substances, by the acts which he had to perpetrate in order to keep the drug use, hustling, stealing, perhaps selling as well, stealing of food stamps from [his girlfriend] as well. These were all indications of impairment and inability to conform to the requirements of the law.... He was satisfying his drug usage and drug need rather than conforming to the law.

We refuse to accept Dr. Don's analysis of the legal requirement of significant impairment of the ability to conform conduct to the requirements of the law. Were we to accept Dr. Don's analysis, we would be required to find the existence of the § 13–703(G)(1) mitigating circumstance in every first-degree murder case in which the defendant was drug intoxicated because each drug-using murderer could argue that his drug use, an illegal act, proved that he was unable to conform his conduct to the requirements of the law.

Having concluded that the testimony of Drs. Don and Hart is, at best, neutral, we are left with the opinions of psychologist Donald Tatro, Ph.D., and psychiatrist Robert Dean, M.D. Dr. Tatro did not testify at trial, but defense counsel did introduce his report on behalf of defendant. In his report, Dr. Tatro essentially concluded that defendant was unable to conform his conduct to the law at the time of the murders—defendant's "homicidal behavior was the result of cocaine intoxication interacting with long-standing psychological conflicts and traits of personality." Dr. Dean, on the other hand, specifically testified that defendant's capacity to conform his behavior was *not* significantly impaired and that defendant was able to exercise control over his acts at the time of the murders.

Nothing in the record indicates that we should give more weight to Dr. Tatro's conclusion than to Dr. Dean's conclusion, and we refuse to do so. Therefore, although the record shows that defendant had a history of chemical abuse and was probably intoxicated at the time of the murders, the evidence does not establish that defendant's drug abuse overwhelmed his ability to control his physical behavior. Defendant did not prove by a preponderance of the evidence that his voluntary intoxication significantly impaired his capacity to conform his conduct to the requirements of the law. Accordingly, the trial court did not err in concluding that defendant did not prove the existence of the § 13–703(G)(1) mitigating circumstance by a preponderance of the evidence. Any mitigating effect of defendant's drug abuse was adequately reflected in the trial court's finding that defendant's intoxication constitutes a non-statutory mitigating factor.

3. Proportionality Review

Defendant argues that a proportionality review is required in all death penalty cases. Such a review is no longer necessary. *State v. Salazar,* 173 Ariz. 399, 844 P.2d 566 (1992).

4. The Domestic Dispute Nature of a First–Degree Murder as a Mitigating Circumstance

Finally, defendant argues that (1) his death sentences must be reduced to life sentences because a domestic dispute should be considered as a mitigating circumstance, and (2) his death sentences are disproportionate to sentences imposed in other Arizona cases involving murders committed during a "domestic dispute." We no longer conduct proportionality reviews (see subsection 3 above); therefore we address only whether the domestic dispute nature of this murder should be considered a non-statutory factor which mitigates against the death sentence.

Defendant cites *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398

(1980), to support his argument. He states that *Godfrey:*

> seems to imply that the extreme emotional trauma and provocation that can arise within domestic conflicts may be an important mitigating circumstance. Or alternatively, that the meaning of heinous or depraved is far more closely circumscribed within the context of such cases.

We disagree. We believe that *Godfrey* stands for the proposition that the death sentence must be imposed in a reasoned rather than an arbitrary manner, not that, as defendant contends, the fact of domestic conflict must somehow be factored into any death penalty equation. Our finding of heinousness or depravity in sentencing defendant to death (see subsection B(1)(b)(ii)) was the result of a reasoned analysis of the 5 *Gretzler* factors. The United States Supreme Court has held this construction constitutional. *State v. Walton,* 159 Ariz. 571, 769 P.2d 1017 (1989), *aff'd,* 497 U.S. 639, 655, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990) ("[W]e have just concluded that the challenged factor [of heinous, cruel or depraved] has been construed by the Arizona courts in a manner that furnishes sufficient guidance to the sentencer."); *State v. Stanley,* 167 Ariz. 519, 531, 809 P.2d 944, 956 ("The United States Supreme Court has specifically found that our construction of these aggravating factors [heinous, cruel or depraved] meets constitutional requirements."), *cert. denied,* — U.S. —, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991).

Defendant would have us reduce his death sentence to life imprisonment because he allegedly killed as a result of a domestic dispute. However, we can think of no rational reason why a defendant should be granted leniency simply because he kills a loved one rather than a stranger. A murder in the context of a "domestic dispute," without more, is not a nonstatutory mitigating circumstance.

5. Sentencing Conclusion

We agree with the trial court that defendant failed to prove the existence of the § 13–703(G)(1) mitigating circumstance by a preponderance of the evidence. After independently weighing the non-statutory mitigating effect of defendant's intoxication against the aggravating circumstances, we conclude that the trial court correctly found that any *one* of the aggravating circumstances outweighs the mitigating circumstance. Defendant's intoxication is not sufficiently substantial to require leniency, and the death penalty is warranted in this case. The death sentences are affirmed.

## CONCLUSION

Pursuant to A.R.S. § 13–4035, we have independently reviewed defendant's convictions and sentences for fundamental error, and we have found no such error. Accordingly, the judgments of conviction and the sentences are affirmed.

FELDMAN, C.J., MOELLER, V.C.J., and ZLAKET and MARTONE, JJ., concur.

## APPENDIX

[caption of State v. Kiles]

### SPECIAL VERDICTS

No. 15444/15577

Pursuant to A.R.S. § 13–703(D) this court returns these special verdicts [regarding defendant Alvie Copeland Kiles] of its findings of the existence or nonexistence of each of the circumstances set forth in § 13–703(F) and of the existence of any of the circumstances included in § 13–703(G). Findings of the existence or nonexistence of each of the aggravating circumstances set forth in § 13–703(F) are based on evidence received during the trial or evidence received during the aggravation/mitigation hearing which would have been admissible under the rules governing the admission of evidence at criminal trials.

*Count One, Case No. 15444*

A. Concerning the conviction of the defendant of first degree murder with premeditation of [the girlfriend], count one, case no. 15444, the court finds the existence of each of these aggravating circum-

stances has been proven beyond a reasonable doubt:

1. The defendant was twice previously convicted of a felony in the United States involving the use or threat of violence on another person, namely:

a. Attempted aggravated assault, class 4 felony, in violation of A.R.S. §§ 13–1001 and 13–1204(A)(1), in case numbered 11966 in this court, the crime having been committed on or about January 1, 1984, as evidenced by State's exhibit 2 received in evidence at the aggravation/mitigation hearing in this case.

b. Aggravated assault, a class 6 felony, in violation of A.R.S. §§ 13–1204(A)(8) and 13–1203, in case numbered 13167 in this court, the crime having been committed on or about April 7, 1986, as evidenced by State's exhibit 2 received in evidence at the aggravation/mitigation hearing in this case.

2. The defendant committed this offense in an especially cruel manner as demonstrated by the prolonged, vicious beating of the victim with a jack stem over a period of time during a portion of which the victim was clearly conscious.

3. The defendant committed this offense in an especially heinous or depraved manner as evidenced by his apparent relishing of the crime, demonstrated by the prolonged, vicious beating of the victim, the infliction of gratuitous violence upon the victim, the helplessness of the victim, and by his stepping on the head of the victim while showing the crime scene to Kale Johnson.

4. The defendant has been convicted of the crime of first degree murder of [the 9–month–old baby] and of the crime of first degree murder of [the 5–year–old child], which crimes were committed during the commission by the defendant of the offense of first degree murder with premeditation of [the girlfriend].

B. The court has considered the aggravating circumstances enumerated in §§ 13–703(F)(1), (3), (4), (5), (7), (9) and (10), and it finds those circumstances do not exist concerning the conviction of the defendant of first degree murder with premeditation of [the girlfriend].

C. The court has considered all the mitigating circumstances enumerated in § 13–703(G) and all other information offered to the court which might be relevant to any mitigating circumstance. The court finds that the defendant was probably under the influence of chemical substances, including alcohol and cocaine, at the time of his commission of this offense, and that his being under that influence is a mitigating factor. However, the court further finds his capacity to appreciate the wrongfulness of his conduct at that time or to conform his conduct at that time to the requirements of law was not significantly impaired.

The court further finds there are no mitigating circumstances sufficiently substantial to call for leniency in determining the sentence to be imposed on the defendant for his commission of this offense.

*Count Two, Case No. 15444*

D. Concerning the conviction of the defendant of first degree murder with premeditation of [the 9–month–old baby], and, in the alternative, first degree felony murder (by child abuse) of [the 9–month–old baby], count two, case no. 15444, the court finds the existence of each of these aggravating circumstances has been proven beyond a reasonable doubt:

1. The defendant was twice previously convicted of a felony in the United States involving the use or threat of violence on another person as stated in finding A.1. above.

2. The defendant committed this offense in an especially heinous or depraved manner as evidenced by his apparent relishing of the crime, demonstrated by his repeatedly striking the child with the jack stem, the infliction of gratuitous violence upon her and her helplessness.

3. The defendant has been convicted of the crime of first degree murder of [the girlfriend] and of the crime of first degree murder of [the 5–year–old child], which crimes were committed during the commis-

sion by the defendant of the offense of first degree murder with premeditation, or, in the alternative, first degree felony murder (by child abuse) of [the 9–month–old baby].

4. The defendant was an adult at the time he committed this offense, and the victim [the 9–month–old baby] was under 15 years of age.

E. The court has considered the aggravating circumstances enumerated in §§ 13–703(F)(1), (3), (4), (5), (7), and (10), and it finds those circumstances do not exist concerning his conviction of first degree murder of [the 9–month–old baby].

F. The court has considered all the mitigating circumstances enumerated in § 13–703(G) and all other information offered to the court which might be relevant to any mitigating circumstance. The court finds that the defendant was probably under the influence of chemical substances, including alcohol and cocaine, at the time of his commission of this offense, and that his being under the influence is a mitigating factor. However, the court further finds his capacity to appreciate the wrongfulness of his conduct at that time or to conform his conduct at that time to the requirements of law was not significantly impaired.

The court further finds there are no mitigating circumstances sufficiently substantial to call for leniency in determining the sentence to be imposed on the defendant for his commission of this offense.

*Count One, Case No. 15577*

G. Concerning the conviction of the defendant of first degree murder with premeditation of [the 5–year–old child], and, in the alternative, first degree felony murder (by child abuse) of [the 5–year–old child], count one, case numbered 15577, the court finds the existence of each of these aggravating circumstances has been proven beyond a reasonable doubt.

1. The defendant was twice previously convicted of a felony in the United States involving the use or threat of violence on another person as stated in finding A.1. above.

2. The defendant committed this offense in an especially cruel, heinous or depraved manner:

a. [The 5–year–old child] was old enough to appreciate and be aware of the protracted and violent assault upon her mother.

b. [The 5–year–old child] witnessed the assault upon her mother [the girlfriend] as demonstrated by defendant's murdering her because she and her sister were screaming and hollering and because she had witnessed the murder of her mother.

c. The terror inflicted on this child by witnessing defendant's actions toward her mother and immediately preceding her own death is beyond imagination and clearly must have conveyed to her the prospect of her own impending death to be accomplished with the same jack stem the defendant wielded over and over again upon the child's mother.

3. The defendant has been convicted of the crime of first degree murder of [the girlfriend] and of the crime of first degree murder of [the 9–month–old baby], which crimes were committed during the commission by the defendant of the offense of first degree murder with premeditation or, in the alternative, first degree felony murder (by child abuse) of [the 5–year–old child].

4. The defendant was an adult at the time he committed this offense, and the victim [5–year–old child] was under 15 years of age.

H. The court has considered the aggravating circumstances enumerated in §§ 13–703(F)(1), (3), (4), (5), (7), and (10), and it finds those circumstances do not exist concerning his conviction of first degree murder of [the 5–year–old child].

I. The court has considered all the mitigation circumstances enumerated in § 13–703(G) and all other information offered to the court which might be relevant to any mitigating circumstance. The court finds that the defendant was probably under the

influence of chemical substances, including alcohol and cocaine, at that time of his commission of this offense, and that his being under the influence is a mitigating factor. However, the court further finds his capacity to appreciate the wrongfulness of his conduct at that time or to conform his conduct at that time to the requirements of law was not significantly impaired.

The court further finds there are no mitigating circumstances sufficiently substantial to call for leniency in determining the sentence to be imposed on the defendant for his commission of this offense.

DATED this 28th day of March, 1990.

DOUGLAS W. KEDDIE
Judge of the Superior Court