883 P.2d 999

STATE of Arizona, Appellee/Cross–Appellant,

v.

John Patrick EASTLACK, Appellant/Cross–Appellee.

No. CR–91–0121–AP.

Supreme Court of Arizona, En Banc.

Nov. 3, 1994.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals, Colleen French, Asst. Atty. Gen., Phoenix, and Stephen D. Neely, Pima County Atty. by Thomas J. Zawada, Deputy County Atty., Tucson, for state.

Isabel G. Garcia, Pima County Legal Defender by Kathleen C. DuBois, Robb P. Holmes, Deputy County Legal Defenders, Tucson, for John Patrick Eastlack.

## OPINION

MOELLER, Vice Chief Justice.

### STATEMENT OF THE CASE

The defendant, John Patrick Eastlack, escaped from an Arizona correctional facility and, before his capture in Texas, committed several crimes in Arizona. A jury convicted him of second degree escape, two counts of second degree burglary, arson of an occupied structure, theft by control of property with a value of more than $100.00 but less than $250.00, first degree burglary, theft by control of an automobile, and two counts of first degree murder. He was sentenced to death for the murders. This is an automatic direct appeal under A.R.S. § 13-4031 and Ariz. R.Crim.P. 26.15 and 31.2(b). We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13-4031 and 13-4033. For reasons we develop more fully below, we affirm all of defendant's convictions but remand for resentencing.

### FACTS

Defendant was serving a nine-year prison term when he escaped from the Arizona Department of Corrections' Wilmot facility in Tucson on August 29, 1989. After running and hiding all night in the desert, he ended up at a townhouse complex in Tucson where he spent the afternoon of August 30 swimming. When darkness approached, he broke into a nearby house (house No. 1). There he made numerous local and long distance phone calls trying to get help from friends and acquaintances, but to no avail. One of his calls was to a friend incarcerated at a Department of Corrections facility. An officer at the facility became suspicious and called the number defendant had left for his friend, which was the number to the phone in

house No. 1. When defendant answered the phone, the officer recognized his voice. Suspecting that the caller was a correctional employee, defendant decided that it was no longer safe to remain at house No. 1. He left the house, leaving his fingerprints behind.

Defendant then spent the night in the pool and jacuzzi of a nearby apartment complex. The next morning he left that complex, walked along a canal, spotted a house with a "for sale" sign (house No. 2), and approached it for a closer look. After spotting alcoholic beverages in the home and deciding that there was probably food and a phone there as well, defendant entered house No. 2. He ate some food, drank some alcohol, and stole several items of personal property, including jewelry, clothing, and a handgun. Although defendant later denied that he was looking for ammunition, in an earlier statement he said, "I searched the whole house and no bullets." Before leaving house No. 2, he set fire to it.

From house No. 2, defendant proceeded to the house of the murder victims, 85–year–old Leicester Sherrill and his 82–year–old wife, Katherine Sherrill. Before being resolved at trial, defendant's intent in going to the house and the sequence of events once he entered were disputed issues. Defendant himself gave conflicting accounts. Initially, defendant stated that he told the Sherrills he was going to rob them. At trial, though, defendant testified that he merely intended to use the Sherrills' phone, that his attacks on the Sherrills were a reflexive, defensive reaction to an attack on him by Mrs. Sherrill, and that taking the Sherrills' car was an afterthought. Notwithstanding these discrepancies, defendant admits that he severely beat the victims and that they both died as a result.

Defendant was 21 years old at the time of the attack and had previous martial arts experience. Eighty-five-year-old Mr. Sherrill weighed 134 pounds. He received a total of 57 wounds, including, below his left eye, fractured bones and a one-half inch deep laceration in which was embedded a piece of wood from a chair leg. He also received a fractured nasal bone; a fractured maxilla; bruises around both eyes and on both cheeks;

bruises on his neck, chest and shoulder regions; a laceration and multiple bruises on his forehead; extensive tears on both arms; a puncture wound on the left side of his neck; broken cartilage and bone around his voice box; multiple bruises on various other parts of his body; possible defensive wounds on his left hand; and 25 separate rib fractures. Medical testimony showed that the rib fractures, the wounds around the voice box, and the blow below the left eye were all potentially fatal.

Eighty-two-year-old Mrs. Sherrill weighed 90 pounds. She received a total of 37 wounds, including bruises and lacerations behind her left ear; tearing of the skin and bruising on her right jaw and cheek; multiple lacerations and skull fractures on the top of her head; scrapes and bruises on her head and neck in the upper back region; a two-inch deep puncture wound on the right front part of her chest; a bruise on her left hand and wrist; and a scrape and bruises on her right hand. Medical testimony showed that any one of the skull fractures she received was potentially fatal and that they were probably the result of a strong, physically fit, 190–200 pound person striking with a blunt object, using close to full force. All of the wounds the doctor examined on both victims were inflicted before death.

After beating the victims, defendant barricaded Mrs. Sherrill in a room, took her car keys from her purse, took one of their cars, and drove to El Paso, Texas, leaving the Sherrills alive, but bleeding and dying. After a flight to and from Miami, Florida, defendant was ultimately arrested in El Paso.

## GUILT PHASE ISSUES

Defendant raises 12 issues relating to the guilt phase of his trial. They are:

1. Whether defendant's post-arrest statements to police officers should have been suppressed as violative of his *Miranda/Edwards* rights.

2. Whether the trial court abused its discretion in denying defendant's motion for a change of venue.

3. Whether defendant's motions for change of the trial judge for cause and to disqualify the presiding judge from selecting the trial judge should have been granted.

4. Whether the trial court erred in refusing to ask the jury panel certain questions posed by defendant.

5. Whether the trial court properly excused a juror who expressed a strong pretrial belief in the credibility of a potential (but uncalled) defense witness.

6. Whether the trial court abused its discretion in denying defendant's motion for mistrial based on a juror's comments to other jurors during the jury selection process.

7. Whether the trial court committed reversible error by admitting hearsay testimony on the results of fingerprint comparisons.

8. Whether the trial court abused its discretion in admitting photographs of the victims' autopsies.

9. Whether the evidence is sufficient to support the jury's finding that the burglary of the Sherrill home was an armed burglary.

10. Whether there was sufficient evidence to support first degree murder convictions under a felony murder theory.

11. Whether defendant's motion for directed verdict on Count Nine (theft) was properly denied and whether the court properly permitted an amendment to Count Nine.

12. Whether the jury instructions contained errors of law.

## DISCUSSION

### A. Guilt Phase Issues

#### 1. Admissibility of Defendant's Statements

In a recorded interview after defendant's arrest, Detective Pantke of the Pima County Sheriff's office questioned defendant at an El Paso police station. Before starting the interview, Pantke reinformed defendant of his *Miranda* rights, and defendant agreed to answer his questions. Defendant first denied knowledge of the crimes for which he was arrested, but when Pantke asked him,

"What if I told you that your prints were also in the arson house?," defendant began to admit his involvement:

Q: Do you remember burning the house?

A: Yeah.

Q: What else did you take from the house when you got the ring?

A: Uh—

Q: How about the necklace you're wearing, John?

A: Yeah, that.

Q: How about the gun?

A: I think I better talk to a lawyer first.

Q: Okay. Does that mean you don't wanna talk to me anymore?

A: Not about that, no. What about the burglaries?

Q: As far as the burglary is—does that mean you wanna talk to me again?

A: Sure.

Q: Okay. 'Cause you already asked for an attorney. You said you didn't want, you didn't wanna talk to me, then you asked for an attorney, but now you're asking to talk to me again, just so I, just so I'm clear in my mind.

A: Right.

Q: You, you do wanna talk to me?

A: Sure.

The interview continued, and defendant admitted his involvement in the crimes for which he was eventually charged, including the murders.

Defendant argues on appeal that his statement, "I think I better talk to a lawyer first," was an unequivocal assertion of his right to counsel. If it was, argues defendant, the detective's subsequent questioning violated his rights under the Fifth and Fourteenth Amendments of the U.S. Constitution, and the trial court should have suppressed all of defendant's subsequent incriminating statements.[1]

An accused in custody, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel

---

1. Defendant's argument is based wholly on federal, not state, constitutional grounds.

has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). The *Edwards* rule is clear—once a criminal suspect during custodial interrogation has invoked his right to have counsel present during questioning, *see Miranda v. Arizona,* 384 U.S. 436, 469–73, 86 S.Ct. 1602, 1625–27, 16 L.Ed.2d 694 (1966), the police must cease questioning until counsel is present or until the suspect validly waives his request.

In resolving *Edwards*-related questions, courts must first determine whether the accused actually invoked his right to counsel. *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984); *State v. Staatz,* 159 Ariz. 411, 413, 768 P.2d 143, 145 (1988). The Supreme Court, in the recent case *Davis v. United States,* — U.S. —, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), set out the proper approach in making this determination and, in doing so, resolved an earlier three-way split of authority. The three different approaches had been: (1) any mention of counsel invokes the right to counsel and requires that all questioning cease; (2) statements that do not meet a threshold standard of clarity do not invoke the right to counsel and questioning may continue on any topic (the threshold approach); and (3) an ambiguous request for counsel requires that all questioning about the offense cease, but the interrogator may ask questions designed to clarify the suspect's desire respecting counsel (the clarification approach). *Id.* at ——, 114 S.Ct. at 2353.

The Court decided that the threshold approach is the correct approach, and it defined the threshold standard as follows: It is an objective inquiry under which the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at ——, 114 S.Ct. at 2355. If the statement meets this level of clarity, all questioning must cease; if, however, anything about the request or the circumstances leading up to it would render the request

ambiguous, *see Smith,* 469 U.S. at 97–98, 105 S.Ct. at 494, the interrogator may continue questioning the suspect on any subject. Although not constitutionally required, the Court did observe that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice … to clarify whether or not he actually wants an attorney." *Davis,* — U.S. at ——, 114 S.Ct. at 2356.

Applying the threshold approach, the Supreme Court upheld the lower court's decision that Davis' statement, "Maybe I should talk to a lawyer first," was not clear enough to invoke the right to counsel. *Id.* at ——, 114 S.Ct. at 2357. All subsequent questioning was thus proper.

Justice Souter, in a concurrence joined by three other justices, would have adopted the clarification approach—that is, faced with an unclear request for counsel, police may continue questioning, but must limit their questioning to clarifying the suspect's intentions. *Id.* at ——, 114 S.Ct. at 2364 (Souter, J., concurring). The concurring opinion, though, expressly rejected the stricter rule that any mention of counsel requires that questioning cease, *id.* at ——, 114 S.Ct. at 2363–64, and agreed that the lower court had not erred in judging Davis' statement to be unclear, *id.* at ——, 114 S.Ct. at 2359. The result of *Davis,* then, is a unanimous Supreme Court holding that an unclear request for counsel does not require that police cease questioning, and a majority holding that the subsequent questioning need not be limited to clarification, but may be on any subject.

■ Turning to the case before us, we hold that Detective Pantke's questioning of defendant Eastlack was entirely proper and was squarely within the boundaries set by both the majority opinion and the concurrence in *Davis.* During the course of custodial interrogation, defendant Eastlack said, "I think I better talk to a lawyer first." At that point, Detective Pantke limited his questioning to clarifying defendant's intentions regarding counsel ("Does that mean you don't wanna talk to me anymore?"). The trial judge found that defendant's statement

was not a clear request for counsel[2] and allowed the subsequent self-incriminating statements to be admitted into evidence.

■ A trial court's ruling on the admissibility of a confession will not be reversed on appeal unless there has been clear and manifest error. *State v. Edwards,* 111 Ariz. 357, 361, 529 P.2d 1174, 1178 (1974). Here, the trial judge committed no such error. Under *Davis,* the request for counsel must be clear under the circumstances. *Davis,* —— U.S. at ——, 114 S.Ct. at 2356. Defendant's statement does not meet this threshold. The statement itself was ambiguous, using the equivocal language "I think" rather than the language of a clear request. The conditions of the interview were neither oppressive nor intimidating, and defendant was not subjected to any "psychological pressure" that might have caused him "to speak in equivocal ... terms when no ambiguity or equivocation [was] meant." *Id.* at ——, 114 S.Ct. at 2361 n. 4 (Souter, J., concurring). Rather, the interview was conducted by one officer in an open office cubicle, not in an isolated interrogation room. Defendant had demonstrated the capacity to express himself clearly, in English, and could have unequivocally requested a lawyer, had he wished to. Moreover, defendant had substantial prior experience with law enforcement officials and was familiar with police interrogation. Under these circumstances, a trial judge could properly conclude that a reasonable police officer would not have understood Eastlack's statement to be a request for counsel. A judge could find that the statement was not clear under the circumstances, and *Davis* expressly requires clarity. *Id.* at ——, 114 S.Ct. at 2356.

Unlike Judge Kleinschmidt, who has filed a special concurrence disagreeing with us on this issue, we do not find persuasive the cases he cites from Texas and California. *See* op. at 1021 (citing *Jones v. State,* 742 S.W.2d 398, 405–06 (Tex.Crim.App.1987); *People v. Dingle,* 174 Cal.App.3d 21, 24–29, 219 Cal.Rptr. 707, 709–12 (1985)). While the Supreme Court had previously declined to discuss the level of clarity required to invoke the right to counsel, *Connecticut v. Barrett,* 479 U.S. 523, 529 n. 3, 107 S.Ct. 828, 832 n. 3, 93 L.Ed.2d 920 (1987); *Smith v. Illinois,* 469 U.S. 91, 95–96 & n. 3, 105 S.Ct. 490, 493 & n. 3, 83 L.Ed.2d 488 (1984), the Court expressly engaged that issue in *Davis.* Both cases cited in the concurring opinion predate *Davis* and thus were decided without the benefit of its guidance. In light of a superseding Supreme Court opinion that decides the point upon which those cases were partly decided, we question whether either case has any remaining precedential value with regard to that issue.

■ However, even if we assume defendant effectively invoked his right to counsel and, therefore, the admission of his statements was error, we conclude, and Judge Kleinschmidt agrees, that the error was harmless. Absent "structural defects," which are not subject to harmless error analysis, an error is harmless "if we can say beyond a reasonable doubt, that the error did not contribute to or affect the jury's verdict." *State v. Bible,* 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993). The inquiry on review "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).

■ Improper admission of involuntary statements is among those kinds of errors that are subject to harmless error analysis. *Arizona v. Fulminante,* 499 U.S. 279, 303, 111 S.Ct. 1246, 1261, 113 L.Ed.2d 302 (1991). The reviewing court may review the record de novo in order to determine an error's harmlessness, *id.,* and having done so, we conclude beyond a reasonable doubt that the admission of the statements did not affect the outcome of this case.

Along with the self-incriminating statements, the jury heard other extremely inculpatory evidence. During his testimony, de-

---

**2.** While the reporter's transcript of the suppression hearing is not clear, both parties agree that the judge did in fact find the request for counsel to be unclear. (Appellant's Op.Br. at 11; Appellee's Ans.Br. at 22.)

fendant admitted that he had killed the victims, describing how and what he used to beat them. Moreover, while in custody in the county jail, a corrections officer overheard defendant describe in detail to another inmate how and why he had killed his victims. He described to the fellow inmate the martial arts maneuvers he had used in his attacks first on the elderly woman and then on the elderly man. The corrections officer overheard and recorded by hand the following exchange:

Defendant: They let me in to use the phone because I was broken down. I couldn't get a tow truck, so I needed their keys. They did not want to reason. I had a [gun]. I couldn't pull the trigger. Makes too much noise. I had to deal with them.

Inmate: Where did it happen?

D: I told them to go into the T.V. room. This was at 12:00, you see, and my face was on T.V. I couldn't let this go on. It was a good kick, one of the best I did.

I: Did the dude see you?

D: She turned around to hand me some M & M's, and I did her the first, knocked her out. The second broke her neck. The third killed her. I have done it three other times. It works real good.

I: How long did it take?

D: The sting took three days. The neighbors found them. I should have put them in the bathroom. It would have taken longer. If they would have given me the keys, none of this would have happened. It was the T.V. that killed them.

I: You went crazy when the dude saw you on T.V.?

D: No, my temper was controlled. I don't lose my temper. That was what my training did for me. I always knew what I was doing.

Because this conversation took place with a fellow inmate, outside the presence of police, there can be no question that it was voluntary. Also, it is equally as damaging as any admission to police because, if true, it proves all the elements of either premeditated first degree murder or felony murder, and it negates any defense based on passion or self defense.

Defendant put forth a very weak defense. First, defendant, a self-described compulsive liar, claimed that he lacked both intent and premeditation and that he did not intend to commit any crime while in the Sherrills' home. Both of these claims are contradicted by credible testimony and physical evidence that he intended both to rob and kill his victims and that his method for killing was both premeditated and deliberate.

Second, defendant testified that he acted in self defense after 90-pound, 82-year-old Mrs. Sherrill attacked him with a fireplace tool. This claim is ridiculous. The jury obviously did not believe that defendant ever perceived any threat from Mrs. Sherrill, a 90-pound octogenarian. Furthermore, the severity of the beatings, including dozens of blows to the head, chest, and neck of each victim, indicates that the killings were anything but defensive.

In sum, because defendant's statement regarding counsel was unclear, Detective Pantke appropriately continued the interview, and the trial court properly admitted into evidence the incriminating statements obtained therefrom. Even if it were error, however, the error was harmless. Along with the statements, the jury received other, equally damaging evidence, and defendant's defense lacked any measure of credibility. Under these circumstances, admitting the confessions, if error, had no effect on the outcome of the trial.

## 2. Change of Venue

■ Defendant's pretrial motion for change of venue was denied. We will not disturb the trial court's decision absent an abuse of discretion. *State v. Chaney*, 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984). This case generated considerable publicity, including coverage on the television program "America's Most Wanted." Much of the post-arrest publicity occurred at the instance of defendant and with his full cooperation and participation against the advice of his counsel. Defendant argues that the source

or reason for the publicity should be of no moment. We need not decide whether a defendant who himself contributes to pretrial publicity can be heard to complain because, in this case, the record shows that the publicity, whatever its source, did not prevent the impaneling of a fair and impartial jury.

Defendant first argues that the media coverage was so extensive that it created a " 'carnival-like' atmosphere," thus allowing us to presume prejudice regardless of the actual effect of the publicity on the particular jurors involved. We recently stated that "[i]f [a] defendant [can] demonstrate that media coverage was so extensive or outrageous that it permeated the proceedings or created a 'carnival-like' atmosphere, we would presume prejudice without a particularized examination of the publicity's effect on the jury." *State v. Atwood,* 171 Ariz. 576, 631, 832 P.2d 593, 648 (1992). To determine whether publicity reaches the presumptively prejudicial level, we look to the United States Supreme Court's rulings in *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (defendant's police interrogation and resulting confession were filmed and broadcast three times in the community where the trial was held); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (media allowed to overrun the courtroom itself during pretrial hearing); and *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (extremely inflammatory publicity and massive amounts of media allowed in the courtroom during trial).

As in *Atwood,* our review of the record reflects nothing comparable to what occurred in *Estes, Sheppard,* or *Rideau.* Defendant points out that his confessions, like those of the defendant in *Rideau,* were disseminated through the media, including television. However, the record here shows nothing of the magnitude of the publicity saturation involved in *Rideau.* In *Rideau,* as many as 97,000 out of 150,000 people in the parish where the defendant was tried viewed a twenty-minute film of the defendant's police interrogation and resulting confession. *Rideau,* 373 U.S. at 724–25, 83 S.Ct. at 1418–19. They saw the defendant "flanked by the sheriff and two state troopers, admitting in

detail the commission of the [crimes] in response to leading questions by the sheriff." *Id.* at 725, 83 S.Ct. at 1419. The Supreme Court held that this pervasive display of "kangaroo court proceedings" was, in essence, the defendant's trial. *Id.* at 726–27, 83 S.Ct. at 1419. The dissemination of defendant's admissions in this case does not rise nearly to the level of *Rideau.*

Defendant next argues that, if the rule of presumptive prejudice does not apply, the jury panel was in fact prejudiced by the pretrial publicity. A defendant is "entitled 'to demonstrate that the media's coverage of his case ... compromised the ability of the particular jury that heard the case to adjudicate fairly.' " *Atwood,* 171 Ariz. at 631, 832 P.2d at 668. To make this showing, "[d]efendant must show that the jurors have formed preconceived notions concerning the defendant's guilt and that they cannot lay those notions aside." *Chaney,* 141 Ariz. at 302, 686 P.2d at 1272. To prevail, the defendant must demonstrate the publicity's actual prejudicial effect, not merely its extensiveness or pervasiveness. *Id.* Prior knowledge of the case alone is insufficient to disqualify a juror. *Id.*

Although many of the prospective jurors questioned by the trial judge had some prior knowledge of the case, most of it was cursory and gleaned from past media reports. Of the 46 prospective jurors questioned, eight expressed preconceived notions of guilt, and only five of those traced their notions solely to the media coverage. Of the 12 jurors who decided the case, two had no prior knowledge of the case at all, and the remaining 10 possessed only cursory knowledge. No juror expressed an inability to fairly determine the issues in the case from the evidence adduced at trial. We have reviewed the entire jury selection proceedings and conclude that the trial court did not abuse its discretion in denying the motion for change of venue.

### 3. Change of Judge for Cause and Disqualification of Presiding Judge to Assign Judges

The late Judge Meehan, presiding judge of the Pima County Superior Court at the time, originally assigned this case to Judge Truman. Defendant sought to remove Judge

Truman on the theory that she had been selected by Judge Meehan who, in turn, was biased against defendant. In addition to challenging Judge Truman for cause, defendant also sought to disqualify Judge Meehan from selecting the next trial judge, insisting instead upon a verified random procedure.

Defendant also filed a provisional motion for change of judge for cause against Judge Meehan, arguing that in the event he should be selected to preside, he too should be removed. Judge Meehan first denied the motion filed against Judge Truman, stating that there were "absolutely no grounds" set forth in the motion demonstrating any bias or prejudice or inability to conduct a fair and impartial trial. Judge Meehan also denied the request for random selection of a judge, stating that "[r]ule 1 of the Uniform Rules of Procedure for the Superior Court giv[es] the Presiding Judge the authority to assign the case and there [is] no basis either by rule or by statute for random selection by a judge as set forth in the defendant's memorandum."

The effect of Judge Meehan's rulings was that the case remained assigned to Judge Truman. Defendant next filed a peremptory notice of change of judge against Judge Truman pursuant to Ariz.R.Crim.P. 10.2. The case was therefore transferred back to Judge Meehan who, in turn, reassigned it to Judge Brown. After further proceedings, Judge Brown recused himself and returned the case to Judge Meehan for reassignment.

Judge Meehan then reassigned the case to Judge Scholl. Defendant filed a second motion to disqualify Judge Meehan from selecting the judge in this case, again alleging bias. Defendant then filed yet another motion to remove newly assigned Judge Scholl for cause because the case had been assigned to him by Judge Meehan. Judge Meehan denied this last motion by minute entry, stating that defendant had "alleged no grounds of interest or prejudice as to Judge Scholl nor any specific grounds for change of judge."

Defendant argues that he was denied his right to a fair and impartial trial presided over by a fair and impartial judge. He contends that the method of selecting the judge was unfair, that the presiding judge who selected the trial judge was biased, and that

because of the presiding judge's bias, the judge chosen was also biased. He argues that Judge Meehan's failure to hold a hearing on the motions to remove for cause violated Rule 10.1(c) and his right to due process. He asks us to presume prejudice and grant him a new trial because Judge Meehan made his rulings without an evidentiary hearing.

█ We find no merit in defendant's arguments. First, we agree with Judge Meehan's ruling that "there [is] no basis either by rule or by statute for random selection" of judges in capital (or other) cases. Defendant points to no authority requiring superior courts to make random selections. In fact, Rule 10.1(c) expressly contemplates that the presiding judge selects judges in criminal cases.

█ Second, we do not agree that Judge Meehan was disqualified from selecting the judges in this case. Even if defendant's allegations of bias against Judge Meehan were true so that Judge Meehan was personally disqualified, he had no duty to recuse himself from selecting the judge to hear this case. We held in *State v. Watkins*, 125 Ariz. 570, 611 P.2d 923 (1980), that it was proper for a presiding judge, who was himself successfully challenged for cause, to reassign the case to another judge. Like the judge in *Watkins*, Judge Meehan "made no substantive rulings involving the merits of the case. He performed, instead, the mere preliminary function of assigning the case to an impartial tribunal." *Id.* at 575, 611 P.2d at 928. *Watkins* also destroys defendant's arguments that the biases of an assigning judge (if any) are imputed to the assigned judge.

█ Rule 10.1(a) allows a change of judge for cause "if a fair and impartial hearing or trial cannot be had by reason of the interest or prejudice *of the assigned judge.*" Although Rule 10.1(c) commands that "the presiding judge shall provide for a hearing" after the filing of the motion, this subsection does not require the presiding judge to hold a hearing when the motion fails to allege interest or prejudice on the part of the assigned judge.

It is defendant's responsibility to allege and prove interest or prejudice. In *State v. McCall*, 160 Ariz. 119, 770 P.2d 1165 (1989), we addressed the issue of whether the trial court erred in denying, without an evidentiary hearing, defendant's petition for post-conviction relief, which alleged that the sentencing judge was mentally incompetent. In affirming the denial, we stated that "[a] defendant is entitled to an evidentiary hearing if his petition presents a 'colorable claim[,]' ... [which] exists when the facts alleged by the defendant in support of his claim, if taken as true, would entitle the defendant to relief." *Id.* at 129, 770 P.2d at 1175. We adopt this same standard for purposes of Rule 10.1(c). Judges are required to grant a hearing only when a defendant's motion alleges facts which, if taken as true, would entitle the defendant to relief. We will not require presiding judges to hold meaningless hearings when no grounds for relief are stated in the first instance. Because defendant failed to allege any interest or bias on the part of either Judge Truman or Judge Scholl, the presiding judge properly ruled without a hearing.

### 4. Defendant's Proposed Voir Dire Questions to the Jury

■ Near the conclusion of the court's examination of the jury panel, defense counsel advised the court that he would like to know if any prospective juror "is adopted or has adopted children." When queried by the court as to the reason for such inquiry, defense counsel said that defendant was adopted and hypothesized that if there was enough evidence to support an insanity defense, adoption might become relevant because experts might testify concerning the problems of adoption. It turned out that insanity was not asserted as a defense at trial, and the only mention of adoption was during the sentencing phase. There clearly was no error in refusing to examine the jury on the subject of adoption.

[15] At another point during jury examination, defense counsel asked the trial court to ask the prospective jurors whether any of them "feels that marriages between different ethnic groups is wrong." The trial court offered to ask the jury concerning any prejudice any of them might harbor against defendant himself for racial reasons. Counsel explained that his client was the product of a mixed marriage and argued that if an insanity defense were mounted "all those things are the kind[s] of.things doctors will testify make people grow up to be weird." At that point, defendant withdrew the request. He cannot now complain because the trial court did not examine on the withdrawn subject. *Cf. State v. Moraga*, 98 Ariz. 195, 200, 403 P.2d 289, 293 (1965) (by withdrawing motion for mistrial, defendant waived objection to the proceedings).

### 5. Court's Excusal of Prospective Juror

■ The trial judge read a list of proposed witnesses to the jury panel and asked if any of the prospective jurors knew any of the witnesses. Prospective Juror F responded that he knew two, possibly three, of the proposed defense witnesses, including Pastor N. The following dialogue then occurred between the trial judge and Juror F:

THE COURT: [W]ould you be able to judge their testimony by the same standards as used with all the other witnesses in the case?

VENIREMAN F: I would look at anything Pastor N said and take it as the truth. I know him very well as a minister and as a friend.

· · · · ·

THE COURT: [W]ould you consider all of the testimony of all the people and judge this testimony by the same standards, or do you really believe, before you heard what he had to say if he were called upon in this case, that regardless what anybody else says, what this particular witness would say you believe to be true?

VENIREMAN F: I would believe that [Pastor N] believes it to be true. Whether it was correct or not is another matter, but if Pastor N expressed a certain piece of information, [Pastor N] would believe that as correct.

The judge held a side bar conference with counsel and decided to excuse Juror F. Defense counsel objected and, on appeal, argues

that striking Juror F was an abuse of discretion requiring a new trial. We disagree. First of all, Pastor N did not testify so it is difficult for us to conceive what prejudice attended his excusal, even assuming he should not have been excused.

In any event, the excusal was well within the trial court's discretion. Juror F's initial answer indicates that he would believe whatever the pastor said. Although he later tempered this answer, he still did not show that he could or would judge the pastor's testimony by the same standard as other witnesses. The trial court, which is in the best "position to determine first hand whether a juror can render a fair and impartial verdict," did not abuse its discretion in excusing Juror F. *State v. Rose*, 121 Ariz. 131, 139, 589 P.2d 5, 13 (1978).

### 6. Misconduct of Prospective Juror

█ In this case, the trial judge examined each prospective juror individually. During this process, two prospective jurors (J–1 and J–2) informed the court that another prospective juror (J–3) had mentioned something about the court proceedings while they and other jurors were in the hallway. J–1 had apparently asked J–3, who had already been individually examined, if the court wanted them to explain their answers. J–3 responded that "[t]hey want you to be specific because they asked me to tell them exactly what I knew about the case, and I told them that it had been—that I knew it had been a bludgeoning death. That is what she said." According to J–1, there were ten to fifteen other jurors present, and when J–1 told J–3 that J–3's comment was the first thing she had heard about the case, J–3 said, "Oh, I shouldn't have said that." J–1 stated that the conversation then ceased and "nobody has discussed anything like this." Based on this information, defense counsel moved for a mistrial on the grounds that the jury panel had been tainted. The trial judge denied the motion, finding no prejudice in what was said.

Later, J–2 told the court that J–3 was telling the other jurors about what occurs during individual voir dire, but that she, J–2, did not listen to the conversation. She indi-

cated that the conversation probably only involved J–3 and one other, but that there was a small group of people seated together. J–2 also stated that the conversation might have lasted about five minutes.

Later, the court asked J–1 to identify J–3. The trial judge then questioned J–3 about the conversation. J–3 told the judge that someone had asked her about the voir dire questions, but that she did not state her opinion about the case. J–3 said that she had told others that the court asked her whether or not she thought the defendant was guilty and that her answer was that she did not know. The juror also told J–1 not to be nervous and to be honest.

On appeal, defendant argues that the conversation prejudiced him and that the trial court abused its discretion in not granting a mistrial. We disagree. "[J]uror misconduct warrants a new trial if the defense shows actual prejudice *or if prejudice may be fairly presumed from the facts.*" *State v. Miller*, 178 Ariz. 555, 558, 875 P.2d 788, 791 (1994). Defendant has not shown actual prejudice, nor may it be presumed in this case. The prospective juror, J–3, who made the comments in response to a question from J–1, did not sit on the jury. J–1 sat, but was excused as an alternate at the end of the evidence. J–2 did not sit. Defendant merely asserts that the comments prejudiced him by "compounding the effect of the pretrial publicity regarding this case." We conclude that the trial court was well within its discretion in denying the motion for mistrial. *See State v. Brewer*, 26 Ariz.App. 408, 417, 549 P.2d 188, 197 (1976).

### 7. Hearsay

█ In answer to a question from the prosecutor concerning how defendant had become a suspect in this case, Detective John Sanders of the Pima County Sheriff's office was permitted to answer, over a hearsay objection, that it was because of "Mr. Wertheim [another officer] matching a print found at the Sherrill residence with Mr. Eastlack's." On appeal, defendant cites *State v. Ceja*, 113 Ariz. 39, 546 P.2d 6 (1976), as requiring reversal.

The state contends the statement was not hearsay at all because it was offered not to prove the fingerprint match, but to explain how defendant became a suspect. The state does not explain, however, the relevancy of the latter. In any event, we need not decide the issue because, assuming there was error, it was harmless. The next witness was Wertheim, the officer who performed the test and made the match.

### 8. Photographs

■ The state introduced into evidence several autopsy photographs of both victims during the testimony of Dr. Parks, the medical examiner who performed the autopsies. Doctor Parks' testimony included a description concerning the direction of some of the blows. Defense counsel objected to all the photographs on the grounds that they were irrelevant and that their inflammatory effect outweighed their probative value. The defense contended that the doctor could testify as to the direction of the blows without need of the pictures to aid his testimony. The trial judge overruled the objection, stating that because one of the defenses was self defense,

> the type of injuries sustained ... would be very important as to whether or not there was an excessive use of force or whether it was self-defense. So if the picture has relevancy and probative value, although gruesome ... something like the direction of the force and the location of the sliver might very well be something that the jury would want to consider.

On appeal, defendant renews his objection and adds a new one: that the photos are especially inflammatory because they are in color and not black-and-white. He argues that the pictures showed the wounds after they had been cleaned and scrubbed, thus enhancing their gruesomeness by making the wounds appear fresh, and that although photographs may be used to help a medical examiner describe wounds, the pictures in this case did not materially aid the jury in understanding the doctor's testimony. He argues that the doctor's testimony did not require illustration because it was uncontested. While the doctor's testimony may not have been directly contested by other medical testimony, the defendant himself testified extensively that he acted entirely in self defense in a reflexive reaction.

■ "Trial courts have great discretion in the admission of photographs.... As long as the photograph has some probative value it is admissible even if inflammatory." *State v. Clark*, 126 Ariz. 428, 433, 616 P.2d 888, 893 (1980). The determination of whether photographs are admissible under Rule 403 "will not be disturbed on appeal unless [the court's discretion] has been clearly abused." *Id.* at 434, 616 P.2d at 894.

We agree with the trial court's conclusion that the photographs were relevant and helpful on the issue of self defense. The photographs were also helpful in illustrating the medical examiner's testimony concerning the manner in which the injuries were inflicted, which in turn corroborated the state's theory that the numerous injuries were not simply the result of a reflexive, self-defensive action.

### 9. Armed Burglary

■ A burglary is first degree burglary if the perpetrator is armed. A.R.S. § 13–1508. Defendant argues that he was not armed. He correctly notes the principle that " 'a weapon or dangerous instrument obtained by a burglar during the course of a burglary and held as loot or stolen goods [does] not by itself 'arm' the burglar within the meaning of the Arizona first-degree statute.' " *State v. Williams*, 154 Ariz. 366, 368, 742 P.2d 1352, 1354 (1987) (quoting *State v. Harris*, 151 Ariz. 236, 238, 727 P.2d 14, 16 (1986)). The gun used in the burglary of the Sherrill home had been stolen in defendant's earlier burglary of house No. 2.

■ Defendant misapplies the *Williams* principle. The rule announced in *Williams* is meant to protect against convicting someone of first degree burglary merely because the burglar stole a weapon *from the house burglarized.* It is not meant to immunize burglars who use previously stolen weapons in subsequent burglaries. Regardless of the fact that the gun had earlier been stolen, defendant burglarized the Sherrill home "knowingly possess[ing] ... a deadly weapon

or a dangerous instrument." A.R.S. § 13–1508(A). The jury found defendant guilty of first degree burglary as alleged in the indictment and as defined in the instructions. The fact that the jury did not also find the offense to be a dangerous one avails defendant nothing. *See State v. DiGiulio,* 172 Ariz. 156, 162, 835 P.2d 488, 494 (App.1992); ("There is no constitutional requirement that verdicts be consistent.").

### 10. Felony Murder Instruction

On appeal, defendant challenges the felony murder instruction given by the trial court, although he did not do so at trial. "Failure to object to a jury instruction below precludes defendant from claiming error on appeal unless the error is fundamental.... Error is fundamental only if it goes to the foundation of the case or deprives the defendant of a right essential to his defense." *State v. Valles,* 162 Ariz. 1, 6, 780 P.2d 1049, 1054 (1989); *see also State v. Gendron,* 168 Ariz. 153, 812 P.2d 626 (1991); *State v. King,* 158 Ariz. 419, 763 P.2d 239 (1988).

■ The defendant faults the instruction on four grounds. The first contention, which we find meritless, is that there was insufficient evidence of the predicate felonies of robbery, kidnapping, and burglary, or attempts thereat, to support the instruction. Defendant next contends that because he was not charged with the substantive offense of kidnapping, it may not be used as a predicate felony for felony murder. We disagree. *State v. Arnett,* 158 Ariz. 15, 760 P.2d 1064 (1988). Thirdly, he contends that he received inadequate notice that kidnapping might be used as a predicate felony. Defendant is entitled to notice of the crimes with which he may be convicted, not the manner in which the state will prove his guilt. *State v. Tison,* 129 Ariz. 526, 538, 633 P.2d 335, 347 (1981). Lastly, defendant argues that he cannot be convicted of first degree murder unless all jurors agree on a single theory of first degree murder. We have often rejected that argument. *See, e.g., State v. Arnett,* 158 Ariz. 15, 20, 760 P.2d 1064, 1069 (1988). Thus, there is no error, let alone fundamental error, relative to the felony murder instruction.

### 11. Amendment of Count Nine and Sufficiency of Evidence on Count Nine

Count Nine originally charged defendant with theft by control of property with a value of $1,000 or more. The indictment alleged that the property being controlled was a 1984 Mercury Topaz automobile owned by the Sherrills. At the close of the state's case, defendant moved for acquittal on that count. Recognizing that it had not produced evidence of the value of the car, the state moved to amend Count Nine to allege simply theft of a motor vehicle, which does not require proof of value. The trial court permitted the amendment and denied defendant's motion. Both rulings are challenged on appeal.

■ Defendant argues, essentially, that Rule 13.5(b) only allows amendments for correction of technical or formal defects. It does that, but it also provides that "[t]he charging document shall be deemed amended to conform to the evidence adduced at any court proceeding." *State v. Winter,* 146 Ariz. 461, 465, 706 P.2d 1228, 1232 (App.1985), holds that the indictment is "automatically amended to conform to the trial evidence, provided the amendment makes no change in the nature of the underlying crime." The evidence was that defendant stole the Sherrills' car. That is exactly what the indictment originally alleged, except that it had a superfluous allegation of value. The amendment, properly made to conform to the trial evidence, did not change the nature of the underlying crime. *Id.* at 464, 706 P.2d at 1231.

■ Defendant challenges not only the amendment but the sufficiency of the evidence on Count Nine. After making and losing a motion for a directed verdict, a defendant has the choice of resting on the motion or proceeding with his case. *State v. Marchesano,* 162 Ariz. 308, 311, 783 P.2d 247, 250 (App.1989). If he proceeds, he runs the risk of curing any deficiency in the state's case through introduction of his own evidence. *Id.* at 312, 783 P.2d at 251. On appeal, "'the question of the sufficiency of the evidence to sustain the verdict ... is ... determined ... by a consideration of all the

evidence presented in the case.' " *Id.* (quoting *State v. Weis*, 92 Ariz. 254, 261, 375 P.2d 735, 740 (1962)).

■ Clearly, by the end of the case there was ample evidence to support a conviction on Count Nine. Defendant himself testified that he stole the Sherrill car. He took it without their permission, drove it to Texas, and gave it away to a stranger, amply supporting a finding of intent to deprive. A.R.S. §§ 13–1801(A)(4), 13–1802(A)(1). His attorney asked the jury, in final argument, to find defendant guilty on Count Nine. The evidence on Count Nine was clearly sufficient.

### 12. Jury Instructions

■ On premeditation, the trial court instructed that

[p]remeditation means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. The time for reflection must be longer than the time required merely to form the intent or knowledge that conduct will cause death. *However, no appreciable length of time must elapse between the formation of the intent to kill and the act; they may be as instantaneous as successive thoughts of the mind.* An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

Defendant argues that the emphasized language was misleading.

We addressed this issue in *State v. Guerra*, 161 Ariz. 289, 294, 778 P.2d 1185, 1190 (1989), where we stated

a jury may be misled by an instruction placing undue emphasis on the rapidity with which premeditation can occur.... However, jury instructions must be considered as a whole.... A case will not be reversed because some isolated portion of an instruction might be misleading.... Although we have problems with the "no appreciable space of time" language, we find that the remaining portions of the instructions clarified the definition of premeditation.

Although the premeditation instruction in this case contained the problematic "no appreciable space of time" language, the instruction also stated, "[t]he time for reflection must be longer than the time required merely to form the intent or knowledge that conduct will cause death." It also provided that an act would not be premeditated if it was the instant effect of a sudden quarrel or heat of passion. The instruction is at least as balanced as that in *Guerra*, so there is no error.

■ Defendant next argues that the trial court erred by failing to define "unlawfully" in its arson instruction. Defendant did not request such an instruction, nor did he object to the trial court's failure to separately define it as part of the arson instruction. Moreover, the term "unlawfully" was defined in the instruction on burglary. Defendant, relying upon *State v. Newfield*, 161 Ariz. 470, 778 P.2d 1366 (App.1989), argues that the failure to define "unlawfully" as part of the arson instruction itself was fundamental error requiring reversal.

■ "[F]ailure to give a certain instruction is not reversible error unless it is prejudicial to the rights of a defendant, and such prejudice will not be presumed but must appear from the record." *State v. Islas*, 132 Ariz. 590, 591, 647 P.2d 1188, 1189 (App. 1982). In *Newfield*, the case relied upon by defendant, there was evidence which, if believed, would support a finding that the defendant was burning his own car. Under those facts, the court of appeals held that the term "unlawfully" should have been expressly defined for the jury. Here, defendant testified that he was in the house without permission and that he intentionally started the fire. His attorney told the jury during closing argument that defendant was guilty of arson. It is obvious that there is no question relative to the unlawfulness of the arson. A trial court is not required to define every phrase or word used in the instructions, especially when they are used in their ordinary sense and are commonly understood. *State v. Valles*, 162 Ariz. 1, 6, 780 P.2d 1049, 1054 (1989). The term "unlawfully" was so used and understood in this case,

and a separate definition was not necessary; therefore, there was no fundamental error. *See State v. West,* 176 Ariz. 432, 445, 862 P.2d 192, 205 (1993).

■ Defendant next argues that the trial court omitted a necessary element of second degree escape in its instruction on that charge. Specifically, the instruction did not include a requirement that the escaping person be in custody for a felony. No objection was made in the trial court on this ground. Defendant's argument overlooks the fact that he was charged with second degree escape pursuant to A.R.S. § 13–2503(A)(1), which defines second degree escape as "knowingly ... [e]scaping or attempting to escape from a correctional facility." It is a different subsection, § 13–2503(A)(2), not § 13–2503(A)(1), which provides that the escapee must have been in custody for a felony. There is no such requirement when the escape is from a correctional facility.

## B. Sentencing Issues

### 1. Denial of Continuance of Sentencing Hearing to Enable Defendant to Obtain Expert Assistance on Possible Mitigation

■ The things that were done and not done between the time of the jury's finding of guilt and the sentencing in this case leave much to be desired. Given the totality of circumstances, we conclude that the present sentences must be vacated and remanded for resentencing after the appointment of an appropriate expert to assist defendant in determining whether there is additional mitigating evidence to be presented and, if so, to assist defendant in presenting it.[3]

■ The law in this area is quite straightforward. If a preliminary showing is made that sanity at the time of the offense is likely to be a significant factor at trial, the federal constitution requires the state to provide access to a psychiatrist's assistance if the defendant cannot afford it. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In this case, defendant received the benefit of that constitutional right, because the trial court did appoint, long before trial, two experts to examine the defendant. Both concluded that he was not M'Naghten insane at the time of the offenses, and insanity was not tendered as a defense at trial. In a capital case, however, the defendant also enjoys a corresponding constitutional protection at the sentencing phase. *See id.* at 82–84, 105 S.Ct. at 1096; *see also Smith v. McCormick,* 914 F.2d 1153 (9th Cir.1990). In Arizona, this right is codified at A.R.S. § 13–4013(B), which specifically provides:

> When a person is charged with a capital offense the court may on its own initiative *and shall upon application of the defendant* and a showing that the defendant is financially unable to pay for such services, *appoint such investigators and expert witnesses as are reasonably necessary adequately to present his defense at trial and at any subsequent proceeding.* Compensation for such investigators and expert witnesses shall be such amount as the court in its discretion deems reasonable and shall be paid by the county.

(Emphasis added.)

■ It is clear that an indigent defendant in a capital case has an absolute right to the help of expert witnesses at the sentencing stage and to have those witnesses reasonably compensated by the county.[4] While the applicable law is clear, the facts leading to the present predicament are more labyrinthine and lead us to conclude that defendant was denied a potentially valuable right at the

**3.** We are aware of recently enacted A.R.S. § 13–703.01 dealing with appellate procedures in death penalty cases. This case was briefed and argued before that statute was enacted. Accordingly, we decide no issue relative to the statute's applicability or constitutionality. We do note, however, that it does not preclude remand where the appellate record is insufficient. Here we are remanding because the record may be insufficient.

**4.** The state on appeal suggests that defendant might not have been indigent at the time of sentencing, but this argument was not advanced in the trial court, where a finding of indigency had previously been made. If there are questions concerning defendant's present indigency status, they may be resolved by the trial court on remand before proceeding with resentencing.

sentencing phase. We accordingly set forth those facts in some detail.

The trial ended on November 20, and the sentencing hearing was first set for December 20. On December 19, defense counsel moved to continue the hearing, pleading lack of time to prepare due to his trial schedule and the holidays. The hearing was reset for January 29, and on January 14, counsel submitted his mitigation witness list which included a "[m]ental health expert to be named later."

On January 25, counsel moved for another continuance stating that defendant

> is entitled to present to this Court testimony reference any personality or mental disorders which could support the finding of a mitigating factor. Defendant's attorney has met with a group of mental health experts who feel John's history and behavior indicate some sort of disorder. The Defense has contacted a prominent mental health expert who has agreed to conduct the necessary examinations and render a report.

The hearing was reset for March 7 and later reset, at the state's request, to April 2. Counsel, on what appears to be March 14, again moved to continue, asserting as grounds: "Investigation not complete. Mental health experts have not yet completed their testing and evaluations[, and] [d]efendant's family have retained an attorney to represent their interest. That attorney has not had sufficient time to review the file such that she can present whatever mitigation she feels is appropriate."

On March 25, the court heard and denied this motion to continue, stating in its minute entry that "April 2nd, 1991 will be over four months since the jury verdict and sufficient time has gone by and the matter will proceed on April 2, 1991."

In the meantime, at some point the Tucson mental health expert mentioned in defendant's January 25 motion decided he should not do the evaluation because he knew defendant's mother, who is a clinical psychologist in private practice. Later, counsel construed this to mean that "there were no mental health experts in Pima County at all that

could get involved in this evaluation." Also at some point, defendant's mother referred counsel to an expert in Maricopa County who, in turn, referred him to Dr. Ann Scherzer, a psychiatrist, and Dr. John DiBicco, a psychologist, both practicing in Phoenix. On February 18, defense counsel wrote to these two experts requesting their services. After discussions about fees, defense counsel apparently requested, sometime before March 15, that the court authorize the expenditures necessary to have these two doctors evaluate defendant. The request is not in the record, but the trial court mentioned it in its minute entry of March 15, stating that it had

> reviewed the defendant's request for authorization for the expenditure of funds.... A psychiatrist or psychologist in Pima County charges $300 for an evaluation of a defendant. They then charge $300 for five hours of in-court testimony. The psychiatrist from Phoenix requests $300 per hour plus $3,000 per day for a court appearance plus travel expenses. This is totally out of line with the fees charged by other mental health experts on court appearances; therefore, IT IS ORDERED approving a total of $1,000 for the defendant's use of mental health experts.

The Phoenix psychologist, Dr. DiBicco, had apparently indicated that he would do the psychological evaluation for $750 on the assumption that defendant would be transported to Maricopa County for examination.

By the time the court authorized the $1,000, the two Phoenix experts were no longer available. Defense counsel contends this put him in a quandary because he only had two weeks to hire experts and do the evaluations. He argued that the lack of time was not his fault because he was not initially aware of the importance of seeking mental health experts and, therefore, did not begin his search until mid-February.

On the day of the sentencing hearing, defendant's mother, stepfather, sister, a family friend, and an attorney from the Capital Representation Project all filed affidavits with the court describing defense counsel's preparation, or lack thereof, for the sentencing hearing. Defendant's stepfather, Donald Norgard, reported on a January 10, 1991

meeting with defense counsel Edward Nesbitt at which Nesbitt

> advised the group that we ... were wasting our time and energy in finding witnesses to testify concerning John's past non-violent behavior, his diminished mental capacity, and his early childhood lack of bonding and attachment problems. He further stated that it didn't matter what mitigating factors were presented at the hearing because as almost everyone in the Tucson legal community knew, Judge Scholl was going to give John the death penalty.

Norgard stated that Nesbitt agreed at this meeting to seek funding for mental health experts.

John O'Dowd, a friend of defendant's parents, reported on the same meeting and stated that "Nesbitt expressed a willingness to obtain a continuance of the hearing and to Petition the Court for funds to employ a psychologist. Kathy [defendant's mother] agreed to provide Nesbitt with the names of psychologists to act as expert witnesses." O'Dowd recalls "having the definite impression that Nesbitt was willing to work with Kathy to obtain an expert witness to evaluate John and testify at trial."

The affidavit of Katherine Norgard, defendant's mother, stated that she had called the January 10 meeting to "insure that Nesbitt would request mental health evaluations (psychiatric, psychological, neuropsychological and a brain scan, if needed)." She stated that "Nesbitt talked on and on about his assessment how it didn't really matter what was presented and that we were all, in essence, wasting our time, but that he did not believe that anything could hurt John's case. No matter what we did or presented, it was a foregone conclusion that John was going to get the death penalty." According to Mrs. Norgard, "Nesbitt promised that he would ask the court for an appropriation of money for mental health experts to evaluate John and to testify on John's behalf." She further stated that "[s]ome few days after this meeting, I called Nesbitt with a Dr. Bud Bolton's name and telephone number. Dr. Bolton had agreed to discuss the case with Nesbitt and recommend Phoenix psychiatrists and

psychologists who could potentially evaluate John and testify. Nesbitt promised to contact these people."

Defendant's sister, Sonda Eastlack, recalled Nesbitt stating at the meeting that "he was setting this case up for appeals, so if things did not go as well as they could it would just make for better appeals."

John R. Hannah, who worked for the Capital Representation Project at the time, described in his affidavit a phone conversation on January 17 in which Nesbitt stated that he "intentionally failed to pursue potential defenses and mitigation arguments so that there would be issues to raise in a Rule 32 proceeding." Hannah asked Nesbitt about psychological testing and Nesbitt responded that he

> had sought no mental health examination of Mr. Eastlack. [He] discounted the idea of psychological testing because he thought that Mr. Eastlack had probably taken a lot of psychological tests because his mother was "a psychiatrist, a psychologist, something like that," so that Mr. Eastlack had learned to manipulate the tests.

We are, of course, aware that no evidentiary hearing has been held on the matters asserted in the affidavits and that defense counsel's view of the meeting and conversations may be entirely different. Because the trial court ruled on the motion to continue without the benefit of an evidentiary hearing, we must also.

This, then, was the state of the record when counsel renewed his motion to continue at the start of the sentencing hearing. He argued:

> Mental health experts I have spoken to have assured me there is no guarantee one way or the other as to what the ultimate outcome of their evaluations is going to be. So I don't know if I go through all these evaluations, I can't tell the Court I will have mitigating evidence, I can't tell the Court I won't. But I feel it is necessary that these matters be explored so that I might have the benefit of those reports, so that I might even decide to use them or not to use them.

The trial court considered the quest too speculative: "It is a search here to try to come up, create some kind of mitigating factors. And as you mention in your argument, there is no way you can tell at the end of this evaluation whether or not you have any mitigating factors or not." Counsel contended that it was not speculative because defendant's mother, a mental health expert, "indicated to me there is something there sufficient to be a mitigating circumstance" but that he obviously could not call her to testify.

The court denied the renewed motion to continue, noting the amount of time between the conviction and the hearing and also noting that numerous letters in the file indicated that someone in the mental health field "would come forward and see to it that an injustice was not done." Concerning the funds, the court said,

> [T]here has been a search made in Phoenix, and you have come across a doctor who is requesting 3,000 a day and $300 an hour, and the meter starts running from the time the person leaves the office. That is—that dollar amount is far greater than what we pay experts generally in the Tucson area for evaluations. For that reason, that is why the Court put a ceiling on the amount of money that could be spent.

Counsel responded by arguing that the problem was not in finding experts willing to do the evaluations. The problem was in finding experts in Pima County who felt they could do an ethical and unbiased evaluation, given the conflict of interest created by their associations with defendant's mother. Counsel argued that $1,000 was not enough to pay for a proper evaluation.

■ To find abuse of discretion, this court "must determine that the denial or restriction of ... funds substantially prejudiced the defendant." *State v. Clabourne*, 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984). Despite what may have been dilatory behavior on the part of defense counsel, we hold that, under the peculiar facts and circumstances of this case, it was improper to proceed to sentencing without providing defendant the opportunity of expert assistance.

*Cf. State v. Knapp*, 114 Ariz. 531, 540–41, 562 P.2d 704, 713–14 (1977). Having thoroughly reviewed the record, we find that defendant had the constitutional and statutory right to the assistance of proper psychological testing and expert assistance.

In addition to the foregoing procedural posture of the case, we base our decision on additional factors. The first is the plain fact that defendant had been convicted of two horrible murders. It was very likely that the court would find one or more statutory aggravating factors, thus finding defendant to be death eligible. Once death eligible, there was a strong possibility of a death sentence unless someone produced mitigating evidence sufficient to call for leniency. The most likely source of such mitigation lies in defendant's psychological and mental makeup and his behavioral background.

■ We have carefully reviewed defendant's trial testimony and suggest that it, in and of itself, contains numerous "red flags" concerning defendant's psychological makeup. Additionally, there were before the court the reports of the two Rule 11 doctors. The psychologist reported that defendant reported using cocaine two hours before the murders and noted that it was likely that intoxication would compromise defendant's impulse control and judgment.[5] While the psychologist found no psychosis or mental illness, he did find defendant to be "hypomanic ... which is likely reflective of characterologic pathology." The Rule 11 psychiatrist found no mental disease, but found that defendant had an antisocial personality disorder and that his mental condition may have been altered at the time of the murders due to cocaine use. We note that in some instances, even voluntary drug intoxication may be a mitigating factor in a capital case. *State v. Gallegos*, 178 Ariz. 1, 17, 870 P.2d 1097, 1113 (1994); *State v. Kiles*, 175 Ariz. 358, 374, 857 P.2d 1212, 1228 (1993).

In addition, there was evidence at the sentencing hearing itself which bears on whether an outside expert should have been appointed. We are aware that this evidence was received after the trial court denied the

---

**5.** Defendant also told Officer Pantke that he was on cocaine.

motion to continue, but it was received before the sentences were imposed and when the trial court could still have continued the sentencing hearing.

Defendant's mother, a practicing psychologist, testified she believed her son was psychologically impaired. He had lived in numerous foster homes before being adopted at 16 months of age. She thought he might have brain lesions or neurological problems and was concerned that he did not receive proper bonding and attachment during the early part of his life, which she believes are critical to adult development. She reported that defendant did not cry, even as a baby, in situations when a child would normally cry. He would grin inappropriately when he was disciplined, when he was embarrassed, or when he was caught doing something wrong. Defendant had learning problems, and she had him evaluated by professionals, one of whom characterized defendant as an "enigma in terms of diagnostic assessment." None of the professionals could discover the source of defendant's problems. He stole from other children and from his family, lied, created and lived in his own separate fantasy world, and had a pronounced fear of being alone.

Dr. Ann Nichols, a family friend with a doctorate degree in social welfare, testified about the importance of bonding during the first year of a child's life. She expressed concern about defendant's mental health and cited his learning and behavioral problems, and his "dissociation between himself and what happened" as the sources of her concern. She believes defendant's behavioral age is 12–14 years.

This evidence certainly suggests the appointment of an expert to determine whether additional mitigating evidence is available. It also suggests that reports and records from defendant's earlier referrals might be available for review by that expert.

Considering all factors, we conclude that the appointment of an independent expert might well have produced mitigating evidence. Unlike the dissent, we do not view this conclusion to be at variance with *State v. Michael Apelt*, 176 Ariz. 349, 861 P.2d 634 (1993). It may well be that defense counsel did not act in a timely fashion, but it is also true that he did not receive the denial of his requested funds and the authorization for the smaller amount until shortly before the hearing. We therefore hold that the trial judge should have continued the sentencing hearing, done whatever was necessary to regularize the proceedings, and arranged for the appointment of an appropriate expert at reasonable cost before proceeding to sentencing in this capital case.

## 2. Participation of Counsel and Trial Court in Sentencing

Defendant contends that the trial judge erred by not permitting defendant's court appointed counsel to withdraw from the sentencing proceedings and committed further error in not recusing himself and transferring the case to another judge for sentencing. Because we are ordering a new sentencing, we briefly state our conclusions on these points so the trial court and parties will know how to proceed. We do not engage in an extended discussion of the alleged facts because they are *sui generis* and will have no applicability to any other case.

We hold first that the trial court is not disqualified from participating in further proceedings in this case. The ex parte, on-the-record conference between defense counsel and the trial court, which defendant claims requires recusal, was with defendant's express consent and was, in fact, necessitated by him. With respect to the motion of counsel to withdraw, we assume the circumstances that led to it will not recur and that the court and parties may have an orderly resentencing. Defense counsel is not disqualified from participation in the resentencing.

## 3. Other Sentencing Issues

Defendant raised numerous other issues relating to sentencing and the state raises one sentencing issue by cross-appeal. Our remand for resentencing renders these issues moot until and unless defendant is resentenced to death. If he is, an automatic appeal will be required and we will deal with any sentencing issues which are then material.

## DISPOSITION AND PROCEEDINGS ON REMAND

██ All of defendant's convictions are affirmed. The case is remanded for another sentencing hearing and for resentencing on all counts. The trial judge and defendant's court appointed counsel are not disqualified from participating in the resentencing process.[6] All evidence received at trial and at the first sentencing hearing may be used at the resentencing.

Following remand, the trial court shall set a presentence conference pursuant to Rule 26.3(c)(2) and shall make suitable arrangements for the appointment of an appropriate mental health or other expert to assist defendant and his counsel at resentencing at public expense (assuming indigency). The court shall set a reasonable time for the defendant's disclosure statement required by Rule 15.2(g). With respect to the findings on resentencing, the trial court is reminded of the specificity requirement of A.R.S. § 13–703(D) with respect to the statutory and mitigating factors listed in section 13–703(F) and (G) and of the case law requests for specificity on nonstatutory mitigating factors. *See State v. Hill*, 174 Ariz. 313, 330, 848 P.2d 1375, 1392 (1993) ("[T]rial judges should discuss all factors considered in mitigation."); *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989).

CORCORAN and ZLAKET, JJ., concur.

THOMAS C. KLEINSCHMIDT, Court of Appeals Judge, concurring.

I agree with the majority in all respects except one. I do not agree with the conclusion that the trial judge correctly ruled that the words, "I think I better talk to a lawyer first," were not a clear request for an attorney. While I can imagine situations involving a police interrogation in which the statement, "I think I better talk to an attorney," might be ambiguous in context, such is not the case here. The words, "I think," are not, as used by most people, all that ambiguous. As Justice O'Connor, writing for the majority in *Davis*, said:

Although a suspect need not "speak with the discrimination of an Oxford don," post at ——, —— U.S. at ——, 114 S.Ct. at 2363–64, 129 L.Ed.2d at 382 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

—— U.S. at ——, 114 S.Ct. at 2355, 129 L.Ed.2d at 371.

In *Davis* itself, when the defendant told the police, "I think I want a lawyer before I say anything else," they ceased their questioning immediately. While the court was not called upon in *Davis* to consider whether these words were an unequivocal request for counsel, it is interesting that the police apparently understood them as such.

At least one court has expressly held that the words, "I think I want a lawyer," are a clear and unequivocal invocation of the right to counsel. *Jones v. State*, 742 S.W.2d 398, 405–06 (Tex.1987); *see also People v. Dingle*, 174 Cal.App.3d 21, 219 Cal.Rptr. 707 (1985) (finding "I think now that you told me what you think, I better talk to a lawyer" was an unequivocal request).

I also think that it is unsafe to assume, as the majority does, that the trial judge found that the words, "I think I better talk to an attorney," were not an invocation of the right to counsel. The judge, in ruling on the motion to suppress, found that the defendant did not make a clear request for counsel, but then said:

> In fact, the following statements [referring to the dialogue between the defendant and the detective about whether the defendant wanted to go on talking] clearly show that he did want to talk and wasn't making a clear request for an attorney.

Thus, the trial judge relied heavily on what the defendant said when the detective was trying to "clarify" the request for counsel. This is impermissible under *Smith v. Illinois*, 469 U.S. 91, 100, 105 S.Ct. 490, 495, 83 L.Ed.2d 488 (1984). Stripped of this imper-

---

**6.** We also note that renewal of rights to an automatic change of judge under Rule 10.4(b) are triggered only by remands for new trial, not for new sentencings.

missible consideration, I cannot say that the judge would have, indeed in my opinion could not have, found the request ambiguous on this record.

In my opinion, the confession which followed the invocation of the right to counsel should have been suppressed. I would not reverse on this ground because I agree with the majority that the admission of the confession was harmless beyond a reasonable doubt.

MARTONE, Justice, dissenting in part.

While I join the court in affirming the convictions, I dissent from that part of the opinion which remands for resentencing.

The court holds that the trial judge should have continued the sentencing hearing and arranged for the appointment of an expert. *Ante,* at 1018. But how did the judge abuse his discretion in denying the motion to continue? Was it because, as the court argues, defense counsel had only two weeks, the time between the March 15 order authorizing expenses of $1,000 and the April 2 hearing date, to retain a mental health expert? *Id.* But the defendant clearly had more than two weeks to retain an expert. He just failed to make the necessary effort to do so.

The first sentencing hearing was set for December 20, thirty days after the trial ended. Although defense counsel had scheduling conflicts that prevented him from being fully prepared for the hearing, and was therefore granted a continuance, he could have at least begun the process of searching for an appropriate expert. If nothing else, he could have asked the defendant's mother, a practicing psychologist, to provide him with a list of qualified experts in the area. Instead, he did not begin searching until mid-February, claiming he did not understand the importance of retaining a mental health expert. *Ante,* at 1016. Yet, in his January 14 witness list, he indicated his intent to retain an expert, and in his January 25 motion to continue, he indicated that he had found one. *Ante,* at 1015.

Apparently, however, the Tucson expert referred to in defendant's January 25 motion opted out because he knew the defendant's mother. From that point on, defense counsel made absolutely *no* attempt to retain an expert from Pima County, claiming that there were "none at all" that could get involved in the evaluation. *Ante,* at 1015. Given the size of Tucson's mental health community, this seems unlikely in the extreme. On February 18, he wrote to two Phoenix experts who agreed to examine defendant and testify. Thus, even excusing counsel's delay until that point, we know that he had from at least February 18 to find another expert—much longer than the two weeks he claimed to have had. I, therefore, conclude that defendant had plenty of time.

If defendant had the time, then did the trial judge abuse his discretion in limiting expert expenses to $1,000? The record shows that Tucson experts charged approximately $600. Thus, for the judge to have abused his discretion, defendant would have had to have shown an inability to retain any Tucson or Phoenix expert willing to work within the $1,000 limit. But there is nothing in the record from which we could draw either of these conclusions. Defense counsel contacted only *one* Tucson expert. After that expert said that he would not conduct the examination, defense counsel turned immediately to the Phoenix market. He apparently contacted only two experts who ultimately agreed to evaluate the defendant. The Phoenix psychiatrist, however, charged $3,000 to testify in court, $300 an hour and travel expenses. The trial judge found that this was totally out of line with the fees charged by other mental health experts. *Ante,* at 1015. Even assuming defense counsel could not have anticipated that the judge would reject an expense over six times that necessary for a local expert, counsel made no further attempt to retain a local expert or make any kind of showing that no Phoenix expert was willing to conduct the examination within the $1,000 limit.

I agree with the court that in a capital case a trial judge ought to authorize the reasonable funds necessary to assist an indigent defendant at a sentencing hearing. But this trial judge did just that. He granted the defendant multiple continuances even when the defendant was making no progress. The

amount the trial judge allotted was reasonable. Defense counsel found at least one mental health expert who would work for the court approved fee. The judge understandably said that four months was long enough. *Id.* How can this be an abuse of discretion? How can the defendant's delay be visited upon the trial judge? If it can, as the court holds here, then how can the judge ever control his docket?

Nor did the defendant ever make the sort of showing that would have suggested that any of the evidence he hoped to find would have assisted him. In *State v. Michael Apelt*, 176 Ariz. 349, 365–67, 861 P.2d 634, 650–52 (1993), we upheld the denial of a motion for extraordinary expenses that was more specific than this one. There, the defendant wanted to go to Germany to develop some evidence regarding a prior psychiatric hospitalization, a difficult childhood, and his low educational level. He did not explain why any of this would be mitigating. We there noted that mere undeveloped assertions that the requested assistance would be beneficial were not enough. In *Apelt*, the defendant moved to continue his sentencing hearing claiming that he was unable to adequately prepare, but we affirmed the trial judge's denial of that motion. *Id.* We said "[w]hether a defendant has made an adequate showing that assistance is reasonably necessary for his defense is left to the discretion of the trial judge." *Id.* We noted, as the court notes here, *ante*, at 1017, that to find an abuse of discretion we must find that the denial or restriction of investigative funds substantially prejudices the defendant.

In *Apelt* the defendant at least offered some explanation. Here, the defendant offered nothing. Instead, the court itself, on a *post hoc* basis, speculates about what an evaluation might uncover and labels them "red flags." *Ante*, at 1017. But what are these? The court notes his use of cocaine, his antisocial personality, and his early life in foster homes. In *Apelt*, the defendant did not offer any reason why "a difficult childhood and lack of education would be mitigating." 176 Ariz. at 366, 861 P.2d at 651. We relied upon *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989) for the proposition that a difficult family background is not a mitigating factor absent a showing that it had something to do with the murder. There was no such showing here. The sentencing judge had the reports of two Rule 11 physicians with respect to the defendant's mental condition. At the hearing, he heard from the defendant's mother, a practicing psychologist, and from Dr. Nichols, a social scientist. Why do we suppose that one more consultation would have made a difference? In my view, the "red flags" uncovered by the court, and not offered by the defendant, are not sufficient to suggest mitigation. Most people who kill others are, by definition, antisocial. Many of them abuse drugs, including cocaine. L. Thomas Winfree, Jr. et al, *Alcohol, Drugs and Murder: A Study of Convicted Homicide Offenders*, 18 J.Crim.Just. 217, 220 (1990). The failure to properly bond and attach during the early part of one's life is the reason that many people are sociopathic. Thus, I would conclude that the red flags, even if properly developed, would not lead to sufficient mitigating evidence to warrant leniency in this case.

We ought not vacate sentences because of the speculative possibility that an additional expert opinion might have been helpful. The defendant made no showing that he would be able to produce mitigating evidence substantial enough to call for leniency. Indeed, he admitted that he could not tell the court whether he would even have mitigating evidence. *Ante*, at 1016. The trial judge here was properly suspicious of the defendant's claim that he could not find a single psychologist in Tucson to testify. The judge authorized a reasonable fee and allowed counsel over four months to find an expert.

I therefore dissent.

FELDMAN, C.J., having recused himself, did not participate in the determination of this matter. Pursuant to article 6, § 3 of the Arizona Constitution, THOMAS C. KLEINSCHMIDT, Judge, Court of Appeals, Division One, sat in his stead.